## No. 80SA167

### R.McG. and C.W. v. J.W. and W.W.

(615 P.2d 666)

Decided August 11, 1980.

Feder, Morris & Tamblyn, P.C., Leonard M. Goldstein, Margaret N. Dillon, for plaintiffs-appellants.

David Burnell Smith, for defendants-appellees.

*En Banc.*

JUSTICE QUINN delivered the opinion of the Court.

This appeal raises the question whether the Uniform Parentage Act (UPA), section 19-6-101 *et seq.*, C.R.S. 1973 (1978 Repl. Vol. 8), by not expressly granting a claiming natural father the right to bring an action for a determination of his paternity of a child born during the marriage of the natural mother to another, violates equal protection of the laws under the federal and state constitutions and the equal rights amendment to the Colorado Constitution.[1] We hold that the claiming natural father is constitutionally entitled to bring this action and reverse the summary judgment denying him statutory capacity or standing to seek a determination of his paternity.

Plaintiff-appellant R.McG. commenced an action in 1978 in the Denver Juvenile Court against defendants-appellees, J.W. and W.W., on behalf of himself and the minor child, C.W.,[2] to establish his paternity of C.W. The complaint alleged that R.McG. is the natural father of C.W., who was born in 1976 to R.McG. and J.W., the natural mother, that at the time of the conception and birth of C.W., J.W. was married to W.W.; that R.McG. is the only man who had sexual intercourse with J.W. at any possible time of conception; that J.W. admitted that R.McG. is the natural father of C.W.; and that blood tests have been unable to exclude R.McG. as the natural father. J.W. and W.W. in their answer denied the alleged paternity of R.McG. and moved for summary judgment on the ground that R.McG. lacked statutory capacity or standing under the UPA to bring the action.[3]

---

[1] The case was transferred to this court from the court of appeals pursuant to section 13-4-110(1)(a), C.R.S. 1973.

[2] Section 19-6-110, C.R.S. 1973 (1978 Repl. Vol. 8), provides that the child whose paternity is in dispute shall be made a party to the action, as well as the natural mother, each man presumed to be the father under section 19-6-105, and each man alleged to be the natural father, if subject to the jurisdiction of the court.

The juvenile court appointed a guardian ad litem for the protection of the interests of the minor child, C.W. Section 19-6-110, C.R.S. 1973 (1978 Repl. Vol. 8).

[3] The juvenile court resolved the motion for summary judgment in terms of R.McG.'s statutory *capacity* to seek a declaration of paternity. The parties in their briefs often posture their arguments in terms of R.McG.'s *standing*. Although in some cases the distinction between capacity and standing may be important, *see Friendly Village v. Silva & Hill Construction Co.,* 31 Cal.App.3d 220, 107 Cal. Rptr. 123 (1973), that distinction is not significant to our determination of this case. Standing problems may be analyzed in terms of two inquiries: (a) whether the party alleges that the challenged action has caused him injury in fact; and (b) whether the interest sought to be protected is arguably within the zone of interests encompassed by the statute or constitutional guarantee in question. *E.g., Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977).

Prior to hearing the motion for summary judgment, the court granted R.McG.'s motion for serological testing of R.McG. and W.W.[4] The results of these tests indicated that R.McG. could not be excluded as the father of C.W., and that the probability of R.McG.'s paternity was 98.89 percent.[5] The testing laboratory was unable to isolate a sufficient number of lymphocytes from the blood sample of W.W. and requested another blood sample from him, but he refused to comply with the request. In opposition to summary judgment R.McG. filed an affidavit stating that he was the natural father of C.W., and that he and J.W. had intercourse regularly at any possible time of conception; that he and J.W. had planned to divorce their respective spouses and marry each other; that J.W. acknowledged in a sworn codicile to her will and in correspondence that he was the natural father of C.W.;[6] and that C.W. had visited almost daily with him until she was 1 1/2 years old and had developed a close relationship with R.McG.'s three other children.

R.McG. opposed the motion for summary judgment on the grounds that the application of the UPA in a manner that denied him statutory capacity or standing to bring an action for a determination of his paternity of C.W. would violate his right to equal protection of the laws under the federal constitution, *U.S. Const.* amend. XIV, and under the state constitution, *Colo. Const.* Art. II, Sec. 25, and also would violate the equal

---

[4] Section 19-6-112, C.R.S. 1973 (1978 Repl. Vol. 8), provides for blood grouping tests and their receipt into evidence, as set forth in section 13-25-126, C.R.S. 1973 (1979 Supp.). Under section 13-25-126(1)(c)(iv) the presumption of legitimacy is overcome if the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, show that the husband or wife is not the parent of the child.

[5] The probability of R.McG.'s paternity of C.W. was calculated by comparing (a) the probability that a mating of a random male in the population of the same race as the putative father with a female of the mother's phenotype would produce an offspring of the child's phenotype, and (b) the probability that a mating of a male of the putative father's phenotype with a female of the mother's phenotype would produce such an offspring.

[6] In the codicil to the will of J.W., she swore that her present husband, W.W., did not have sexual intercourse with her at any time during which C.W. could have been conceived, and W.W. is not and could not be the father of C.W.; J.W. also swore that the only person with whom she had sexual intercourse during the time C.W. could have been conceived was R.McG., and to the best of J.W.'s knowledge R.McG. is the father of C.W. The codicil also contained a request that R.McG. be appointed guardian or custodian parent of C.W. in the event J.W. died while C.W. was an unmarried minor.

rights amendment to the Colorado Constitution, *Colo. Const.* Art. II, Sec. 29.

The juvenile court rejected the constitutional claims of R.McG. and granted the motion for summary judgment on behalf of J.W. and W.W., holding that R.McG. lacked capacity under the UPA to bring this action. We determine that under the circumstances of this case the failure of the UPA to grant R.McG. the right to bring an action for a determination of his paternity of C.W. violates equal protection of the laws under the federal and state constitution and the equal rights amendment to the Colorado Constitution.

## I.

Before the enactment of the UPA, a putative father had no statutory right to commence an action to establish his paternity. The then existing statute authorized an action by the child's mother or guardian or the county department of social services, as the exclusive means of establishing paternity. Section 19-6-101, C.R.S. 1973; *see People in the Interest of L.B.,* 19 Colo. App. 101, 482 P.2d 1010 (1976), *aff'd,* 179 Colo. 11, 498 P.2d 1157 (1972); *appeal dismissed mem.,* 410 U.S. 976, 93 S.Ct. 1497, 36 L.Ed.2d 173 (1973). The UPA was enacted in 1977 and furnishes the statutory framework for the constitutional issues raised on this appeal.

One basic purpose of the UPA is the establishment of the parent-child relationship, section 19-6-104, C.R.S. 1973 (1978 Repl. Vol. 8), and another is the protection of that relationship, section 19-6-103, C.R.S. 1973 (1978 Repl. Vol. 8). Section 19-6-102 defines that relationship as the legal relationship existing between a child and a natural parent, and expressly includes the father-child relationship. The parent-child relationship extends equally to every child and to every parent, regardless of the marital status of the parents. Section 19-6-103, C.R.S. 1973. Section 19-6-104 authorizes the establishment of the paternal relationship between a child and its natural father and recognizes the right of putative fathers to bring an action to establish paternity under the applicable provisions of the UPA.

The UPA, however, makes no provision for a male claiming to be the natural father of a child to bring an action to establish his paternity under the circumstances present here. Section 19-6-107 of the UPA, insofar as pertinent to this case, provides:

"(1) A child, his natural mother, or a man presumed to be his father under section 19-6-105(1)(a) . . . may bring an action:

"(a)    At any time for the purpose of declaring the existence of the father and child relationship presumed under section 19-6-105(1)(a), . . . ; or

"(b)    For the purpose of declaring the nonexistence of the father and child relationship presumed under section 19-6-105(1)(a) . . . only if the action is brought within a reasonable time after obtaining knowledge of

relevant facts, but in no event later than five years after the child's birth. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party."

■ Under section 19-6-105(1)(a) a man is presumed to be the natural father of a child if he and the child's natural mother are or have been married to each other and the child is born during the marriage. Section 19-6-105(2) provides that this presumption and other statutory presumptions of paternity may be rebutted by clear and convincing evidence, and a presumption is rebutted by a court decree establishing paternity in another man.

The juvenile court, relying on the interpretative rule of *expressio unius est exclusio alterius,* reasoned that since section 19-6-107(1) expressly provided that certain categories of persons may commence an action in paternity, including a presumed father under section 19-6-105(1)(a), the legislature thereby intended to prohibit anyone outside the specifically designated categories, such as a claiming natural father not married to the natural mother, from commencing a paternity action in connection with a child born to the natural mother during her marriage to another.

## II.

■ R.McG. argues the juvenile court's construction denying him statutory capacity or standing to establish that he is the natural father of C.W. violates equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article II, Section 25, of the Colorado Constitution,[7] and, in addition, violates the equal rights amendment to the Colorado Constitution, *Colo. Const.* Art. II, Sec. 29. We agree with R.McG.'s argument. The UPA, as construed by the juvenile court, denies R.McG. equal protection by impermissibly discriminating between natural mothers and claiming natural fathers, and such statutory classification is not substantially related to an important governmental interest. *A fortiori,* we also determine that the denial of statutory capacity or standing to R.McG. is based on a gender classification that violates the equal rights amendment to the Colorado Constitution, which prohibits the denial or abridgement of equality of rights on the basis of sex. *Colo. Const.* Art. II, Sec. 29.

■ "Gender-based distinctions 'must serve important governmental objectives and must be substantially related to achievement of these objectives' in order to withstand judicial scrutiny under the Equal Protection Clause." *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d

---

[7] Equal protection of the laws is a constitutionally recognized right included within the due process clause of Article II, Section 25 of the Colorado Constitution. *See Vanderhoof v. People,* 152 Colo. 147, 380 P.2d 903 (1963); *Trueblood v. Tinsley,* 148 Colo. 503, 366 P.2d 655 (1961); *People v. Max,* 70 Colo. 100, 198 P. 150 (1921).

297 (1979); *see Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). No one questions the interest of the state in preserving the integrity of family units already in existence and fostering child rearing in harmonious family settings. *See* section 19-1-102, C.R.S. 1973 (1978 Repl. Vol. 8). These interests are important and within the power of the state to implement. The controversy here is not with governmental ends but rather with the choice of means to achieve those ends:

" . . . [T]he unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction . . . . Rather, under the relevant cases applying the Equal Protection Clause it must be shown that the distinction is structured reasonably to further these ends . . . [S]uch a statutory 'classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Caban v. Mohammed,* 441 U.S. at 391, 99 S.Ct. at 1767, 60 L.Ed.2d at 306.

We, therefore, must analyze the pertinent provisions of the UPA under this intermediate standard of judicial scrutiny applicable to gender-based classifications.

Section 19-6-107(1)(a) grants statutory standing to a child, her natural mother and a presumed father to establish the father-child relationship. Were the restrictive standing provisions to end there, it is at least arguable that the statutory classification, although under-inclusive in its omission of a claiming natural father, might satisfy substantially the governmental interest by insulating a continuing family relationship from the potentially disruptive effects of a judicial determination of paternity in another. However, it is unnecessary for us to resolve that question because constitutional infirmities are evident in section 19-6-107(1)(b), which permits the natural mother to undo the state's interest in preserving family stability by seeking both a declaration of non-paternity in the presumed father and a declaration of paternity in the non-family natural father. Section 19-6-107(1)(b) does not condition the natural mother's right to seek a declaration of paternity in a non-spousal father upon the failure of her existing marriage to the presumed father, or the presumed father's desertion or non-support; the statute requires only that the natural mother's action be commenced within five years after the child's birth.

This statutory scheme creates more than a difference in treatment of natural mothers and fathers. It establishes contrary treatment. Although a statutory classification under the intermediate level of scrutiny need not be tailored precisely to the interest sought to be achieved, it must at least mesh substantially with the purpose that the statutory classification is designed to accommodate. The statutory classification and corresponding difference in treatment created by section 19-6-107(1) fail to pass

constitutional muster under equal protection doctrine. Section 19-6-107(1) exemplifies a gender-based classification predicated on an overbroad generalization that a mother has a legitimate interest in establishing a determination of paternity in a non-spousal father, while such father has no interest in establishing a determination of paternity in himself.[8] *See, e.g., Caban v. Mohammed, supra; Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *cf. Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (unwed father, who never sought custody of eleven-year-old minor child, was granted full hearing on his interest in child, but his interest cannot prevent child's adoption by natural mother's husband). Under the circumstances present here, the claiming natural father, no less than the mother, must have the right to establish the significant relationship of paternity as to the child he has allegedly sired.

The gender-based inequality of section 19-6-107(1) is compounded by the statutory presumption of section 19-6-105(1)(a). Although the UPA makes all presumptions rebuttable by clear and convincing evidence, section 19-6-105(2), C.R.S. 1973 (1978 Repl. Vol. 8), only presumed fathers would have the necessary standing to rebut the presumption under the restrictive categories of section 19-6-107(1). R.McG., in spite of a threshold showing of 98.89 percent probability of his paternity of C.W., is effectively precluded not only from establishing his own claim of paternity but also from rebutting the statutory presumption of paternity in W.W.

■ Under the circumstances of this case, the rebuttable presumption of paternity in W.W., the husband of the natural mother, is converted into a conclusive presumption against the claiming natural father. Thus, the statutory scheme denies the claiming natural father, R.McG., judicial access to establish a constitutionally significant relationship, *Stanley v. Illinois, supra,* while simultaneously granting the natural mother practically unencumbered judicial access to establish that same relationship if she so desires.

Procedure by presumption is permissible, but when that procedure "forecloses the determinative issues . . . [and] explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child." *Stanley v. Illinois, supra.* We hold that so long as the UPA grants a natural mother judicial access for a period of years to seek a determination of paternity against the natural father of a child born during the marriage of the natural mother to another, equal protection of the laws under the

---

[8] Gender as the basis of statutory differential in treatment is also apparent in section 19-6-122, C.R.S. 1973 (1978 Repl. Vol. 8), which provides that any interested party may bring an action to determine the existence or nonexistence of the mother and child relationship. A claiming natural mother, of course, would qualify as an interested party under this section.

United States and Colorado Constitutions mandates that a claiming natural father be granted judicial access and standing to establish his paternity of that child during that same period of time.

Because we have found that section 19-6-107(1) falls short of satisfying the intermediate level of judicial scrutiny applicable to gender-based classification under equal protection doctrine, it necessarily follows that section 19-6-107(1) fails to satisfy the stricter judicial scrutiny standard applicable to the equal rights amendment of the Colorado Constitution, *Colo. Const.* Art. II, Sec. 29. *See People v. Green,* 183 Colo. 25, 514 P.2d 769 (1973).

## III.

The natural mother and her husband, J.W. and W.W., citing *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), contend that granting R.McG. standing to pursue his claim for a declaration of paternity will violate their constitutional right of privacy emanating from the due process clause of the Fourteenth Amendment. The privacy interest implicated in *Griswold* was that of reproductive autonomy. *See Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). That privacy interest belongs to the individual and not to the family as a unit, *e.g., Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and it is not involved in the posture of this case. Moreover, whatever interests of J.W. and W.W. might be impacted by the continuation of R.McG.'s claim, those interests certainly are no greater than the interest of R.McG. in establishing his paternity of C.W., and the interest of C.W. in determining her biological parentage and the rights incident thereto. *See Caban v. Mohammed, supra; Stanley v. Illinois, supra; In re Lisa R.,* 13 Cal.3d 636, 119 Cal.Rptr. 475, 532 P.2d 123, 119 Cal. Rptr. 475, *cert. denied,* 421 U.S. 1014 (1975). Therefore, we find the argument of J.W. and W.W. unpersuasive.

## IV.

We are not unmindful that the continuation of this paternity proceeding might affect the relationship of J.W. and W.W. However, a prohibition of the proceedings will produce at least equally adverse consequences to the claiming father. Also, we are aware of the potential consequences that these proceedings might create for the minor child. In that regard we note that the juvenile court appointed a guardian ad litem to protect the child's interests, and the guardian ad litem's position consistently has been that R.McG. should not be denied standing to establish his claimed parentage of C.W. In fact, after the court granted summary judgment, the guardian ad litem requested the court that it permit the action to continue on behalf of the child so that biological parentage and other rights of the child, such as inheritance and support, might be determined. That request

was denied. The guardian ad litem's position reflects a candid admission that the best interests of the child, under the circumstances of this case, are not necessarily coextensive with those of J.W. and W.W., and are extremely difficult to determine.

■ In summary, we hold that where, as here, the statutory scheme allows a natural mother to seek a judicial declaration of paternity in the natural father in connection with a child born to the natural mother during her marriage to another, the equal protection guarantee of the federal and state constitutions as well as the Colorado equal rights amendment require that a claiming natural father be accorded standing to file and proceed with his claim for a judicial declaration of paternity in himself with respect to a child born to the natural mother during her marriage to another.

The judgment is reversed and the cause is remanded to the juvenile court with directions to vacate the summary judgment and to proceed in a manner consistent with the views expressed herein.

JUSTICE DUBOFSKY specially concurs.

JUSTICE LOHR dissents.

JUSTICE DUBOFSKY specially concurring:

I concur in the majority's result based on the constitutional infirmity in section 19-6-107(1)(b), C.R.S. 1973 (1978 Repl. Vol. 8), but I analyze the putative father's standing to seek a declaration of paternity in terms of due process rather than equal protection.

The majority finds that because the statute allows the mother to seek a determination of paternity in a non-spousal father, and the claiming natural father has no corresponding right to seek a determination of his paternity, the classification discriminates on the basis of gender. The state interest in this statutory scheme, according to the majority, is preserving the integrity of family units already in existence and fostering child rearing in harmonious family settings. Consequently, the statute may be read as protecting the mother's family unit (because her husband is presumed to be the child's father) without providing the same protection for the putative father's family unit.

I believe that the legislature may give preference in paternity proceedings to a mother's family unit in which the child resides without running afoul of constitutional guarantees of equal protection. Usually, no one questions the identity of the mother because of the mother's pregnancy and delivery of the child. Paternity is not as easy to determine.

The statutory preference for the mother's family unit, however, does not entitle the state to exclude by the conclusive presumption in section 19-6-107(1) the putative father's right to a court hearing on his claimed

parenthood. The United States Supreme Court has recognized the due process right of a natural father, absent a finding that he is unfit, to maintain a parental relationship with his children. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). A California Supreme Court decision, *In re Lisa R.,* 13 Cal.3d 636, 532 P.2d 123, 119 Cal.Rptr. 475, *cert. denied,* 421 U.S. 1014, 95 S.Ct. 2421, 44 L.Ed.2d 682 (1975), gave an unwed father standing to challenge a California statute's presumption that a child of a married woman is a legitimate issue of the marriage.[1] The unwed father prevailed because such a presumption is contrary to due process which requires an opportunity for one to be heard in protection of the basic right to conceive and raise one's children. *Stanley v. Illinois, supra; Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

Due process consists of those procedural safe-guards designed to accord to the individual "the right to be heard before being condemned to suffer grievous loss of any kind" as a result of governmental acts or omissions. *Joint Anti-Fascists Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646-7, 95 L.Ed. 817, 852 (1951) (Frankfurter, J., concurring). The nature of due process means that the procedures needed to minimize error and reduce the dangers of arbitrary action vary "according to specific factual contexts." *Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307, 1321 (1960).

In order to determine if due process provides the putative father standing to rebut the presumption that the child is the issue of the mother's husband, we must weigh competing private and state interests. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[2] Here I believe we should weigh the putative father's indication of interest in the child as described in the majority opinion with the state's interest in protecting the integrity of the family unit in which the child resides.[3] Had the father not made continuing efforts to maintain contact with the child and indicated his desire to support the child, the state's interest would prevail. But here, where R.McG. has no alternate remedy to protect his interest as the child's natural father, I think we must find that he has standing

---

[1] Like the Colorado presumption, the California presumption could be rebutted only by the woman and her husband.

[2] Such a weighing process in *Stanley* was struck in favor of the unwed father's right to submit evidence in rebuttal of a presumption that he was unfit to care for his illegitimate children. The weighing process in *Quilloin* found that a court determination of the "best interest" of the child protected the father's due process rights.

[3] Although the best interests of the child are not at issue in this case, the state has a legitimate interest in protecting the integrity of the family unit in which the child resides as opposed to protecting, under an equal protection analysis, the family unit of the putative father in which the child does not reside.

to assert those interests in a court proceeding. Otherwise, his constitutional right to due process of law in order to protect his basic right to conceive and raise his child has been denied.[4]

JUSTICE LOHR dissenting:

The Uniform Parentage Act[1] permits the mother of a child born in wedlock to bring an action to determine that her husband is not the father of the child. The paternity of the child by another man may then be determined in that same action if that other man (third-party father)[2] has been made a party to the action. The third-party father is given no right to bring an action to determine that the husband is not the father of the child. Section 19-6-107, C.R.S. 1973 (1978 Repl. Vol. 8). The majority concludes that such disparity in the rights accorded to the mother and the third-party father denies the latter equal protection of the laws, *U.S. Const.* amend. XIV; *Colo. Const.* Art. II, § 25, and violates the equal rights amendment to the Colorado Constitution, *Colo. Const.* Art. II, § 29. I respectfully dissent.

The facts are set out in the majority opinion.

I.

The Uniform Parentage Act is part of the Colorado Children's Code.[3] The purposes of the Colorado Children's Code have been declared by the General Assembly to include:

"(1) (a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society;

"(b) To preserve and strengthen family ties whenever possible, including improvement of home environment;

. . .

"(2) To carry out these purposes the provisions of this title shall be liberally construed."

Section 19-1-102, C.R.S. 1973.

We have recognized and implemented these purposes in various factual settings. *See R.M. v. District Court,* 191 Colo. 42, 550 P.2d 346 (1976); *In re People in Interest of M.M.,* 184 Colo. 298, 520 P.2d 128 (1974); *see also People in Interest of S.S.T.,* 38 Colo. App. 110, 553

---

[4] His standing to bring a court action to determine paternity is limited by statute to five years for actions to declare the non-existence of a presumed father and child relationship.

[1] Sections 19-6-101 to -129, C.R.S. 1973 (1978 Repl. Vol. 8).

[2] For convenience the term "third-party father" will be used to describe a person who claims to be, or is claimed to be, the natural father of a child born during a marriage, and who is not presumed to the the natural father pursuant to section 19-6-105(1)(a), (b), or (c), C.R.S. 1973 (1978 Repl. Vol. 8).

[3] Title 19, C.R.S. 1973 (1978 Repl. Vol. 8).

P.2d 82 (1976). The public policy reflected in the stated purposes of the Colorado Children's Code is expressed in similar ways in related statutes.[4] There can be no doubt of the strength and legitimacy of the state interest in fostering harmonious marital relationships and strong family relationships. The majority opinion recognizes the strength of the state interest but finds that the means selected to advance that state interest do not pass constitutional muster in this case. I cannot agree.

## II.

· The presumptions of paternity found in the Uniform Parentage Act faithfully implement the declared legislative purposes. The mother's husband is presumed to be the natural father of a child born during a marriage or attempted marriage. Section 19-6-105(1)(a), (b), C.R.S. 1973 (1978 Repl. Vol. 8).[5] He is also presumed to be the natural father of a child born prior to the marriage in certain circumstances where he has married or attempted to marry the mother and has acknowledged paternity. Section 19-6-105(1)(c), C.R.S. 1973 (1978 Repl. Vol. 8). A presumption of paternity exists in another in two instances only: (1) where the third-party father acknowledges paternity in writing, the mother does not dispute the acknowledgment, and any person presumed to be the natural father gives written consent, section 19-6-105(1)(e), C.R.S. 1973 (1978 Repl. Vol. 8); and (2) where the third-party father receives the child into his home and openly holds out the child as his natural child, section 19-6-105(1)(d), C.R.S. 1973 (1978 Repl. Vol. 8).[6] Any presumption of paternity created by the statute may be rebutted only by clear and convincing evidence. Section 19-6-105(2), C.R.S. 1973 (1978 Repl. Vol.

---

[4] The Uniform Marriage Act reflects the legislative purposes of strengthening and preserving the integrity of marriage and safeguarding meaningful family relationships. Sections 14-2-101 to -113, C.R.S. 1973. Section 14-2-102, C.R.S. 1973, provides in pertinent part:

"(1) This part 1 shall be liberally construed and applied to promote its underlying purposes.

. . .

"(a) To strengthen and preserve the integrity of marriage and to safeguard meaningful family relationships;"

These purposes are again expressed in our marriage counseling statute, section 14-12-101, C.R.S. 1973, as follows:

"14-12-101. Legislative declaration. It is the declared public policy of this state to maintain desirable marital and family relations; to promote and foster the marriage relationship and reconciliation of estranged spouses; and to take reasonable measures to preserve marriages, particularly where minor children are involved, in the interest of strengthening the family life foundation of our society, and in reducing the economic and social costs to the state resulting from broken homes. In furtherance of this policy, it is the purpose of this article to make competent marriage counseling services available through the district courts of the state to spouses involved in domestic difficulties."

[5] The presumption of legitimacy is one of the strongest presumptions known to the law. *Beck v. Beck,* 153 Colo. 90, 384 P.2d 731 (1963); *Lanford v. Lanford,* 151 Colo. 211, 377 P.2d 115 (1962). As those cases reflect, the presumption existed long prior to adoption of the Uniform Parentage Act.

[6] In summarizing the statutory presumptions, much of the detail has been omitted in the interest of simplicity.

8).

Only a child, his natural mother, or a man presumed to be his father under section 19-6-105(1)(a), (b), or (c) may bring an action to declare the existence or nonexistence of the father and child relationship presumed under section 19-6-105(1)(a), (b), or (c). Section 19-6-107(1)(a), (b), C.R.S. 1973 (1978 Repl. Vol. 8). No action may be brought more than five years after the birth of the child to declare the nonexistence of the presumed father and child relationship. Section 19-6-107(1)(b), C.R.S. 1973 (1978 Repl. Vol. 8). Thus the persons who may challenge the presumption of the husband's paternity with respect to a child born during a marriage are limited to certain persons inside the family unit created by the marriage, and the time for challenge is limited. The denial of any right of a person outside a family unit to make such a challenge implements the legislative purpose of preserving and strengthening family ties wherever possible.

In the event the presumption of paternity is rebutted in an action brought under section 19-6-107(1)(b), C.R.S. 1973 (1978 Repl. Vol. 8), paternity of the child by another man may be determined in the same action, if he has been made a party. Section 19-6-107(1)(b), C.R.S. 1973 (1978 Repl. Vol. 8). It thus appears that a third-party father would have a right to intervene in such a proceeding, and to participate once the presumption of paternity in the husband has been rebutted. *See* C.R.C.P. 24. It also appears that a third-party father can bring an independent action to establish his paternity after the presumption of the husband's paternity has been rebutted. *See* section 19-6-107(3), C.R.S. 1973 (1978 Repl. Vol. 8), permitting a person alleging himself to be the father to bring such an action "with respect to a child who has no presumed father under section 19-6-105." It would seem that, once the presumption of paternity created by that latter section has been rebutted, the child has no such presumed father.

### III.

We must determine whether creation of the two statutory classes, the members of one of which may challenge the presumption that the husband is the natural father and the members of the other of which may not, denies equal protection of the laws to a third-party father, who is a member of the latter class.

It has been recognized that a man who has sired and raised children born of an unwed mother has a cognizable and substantial interest in retaining custody of his children. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Contrary to the majority's contention, this principle has never been extended to a conclusion that an interest in a determination of parental status with respect to a child born during a marriage exists in a person other than the husband of the mother of that child. Whether such an interest exists in a third-party father at all may be

doubted, at least in circumstances where the child is conceived during the marriage and lives within the family unit after birth. No matter how we may perceive the mores of our society, it is not without significance that adultery is an act so contrary to declared public policy that it has been prohibited in the Colorado Criminal Code in a section enacted in 1971. Section 18-6-501, C.R.S. 1973 (1978 Repl. Vol. 8); *but see Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (the father, who was cohabiting with the mother for a substantial time surrounding the birth of the children, was married to another; the court made nothing of that fact in considering the father's interest with respect to those children). Against the background of that statute and the state interest in preservation of marriages, it requires more imagination than I can summon to find any legitimate expectation of a legally recognized relationship based solely on the blood ties between the child conceived of an adulterous relationship and the natural father of that child.

Even assuming that the third-party father has or can develop an interest which is constitutionally cognizable, the Uniform Parentage Act does not deny him equal protection of the laws in the circumstances of the instant case. Certainly any interest which might be recognized in the third-party father does not rise to the level of a fundamental right, requiring that the legislative classification preventing nonfamily members from attacking the presumption that the husband is the natural father be tested by the standard of strict scrutiny. *See Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The majority opinion does not contend that a standard of strict scrutiny applies.

Absent an infringement of a fundamental right or the creation of a suspect classification, the appropriate test to determine whether equal protection standards are satisfied is whether the classification is reasonable, not arbitrary, and bears a rational relationship to legitimate state objectives. *Mosgrove v. Town of Federal Heights,* 190 Colo. 1, 543 P.2d 715 (1975), *citing Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Mathematical precision in establishing classifications is not required. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

The legislative purpose of preserving the family ties is not only legitimate but strong. It would be difficult to imagine anything more disruptive to a family relationship than a challenge to the presumption that the husband is the father of a child born during the marriage. The recognition of the right of persons within the family unit to make such a challenge simply reflects the reality that, public policy notwithstanding, marriages do fail. *See* Uniform Dissolution of Marriage Act, sections 14-10-101 to -133, C.R.S. 1973. When relationships reach the point that someone within the family wishes to challenge the presumption of the husband's paternity, the legislature could reasonably determine that no useful purpose would be

served by preventing that person from doing so. This is entirely consistent with denial of that right to third-party fathers unless, and until the presumption of the husband's paternity has been rebutted. The statutory classification bears a reasonable relationship to legitimate legislative purposes. *See generally People in Interest of L.B.,* 179 Colo. 11, 498 P.2d 1157 (1972), *appeal dismissed mem.,* 410 U.S. 976, 93 S.Ct. 1497, 36 L.Ed.2d 173 (1973).

## IV.

The majority views the nature of the classification differently and, in my view, erroneously. Because the mother may challenge the presumption, but the third-party father may not, the majority views the classification as gender-based and therefore suspect. But the class which may challenge the classification extends beyond the mother to her husband, and to the child, who may be of either gender. The criterion for membership in the class is not gender-based, so the higher level of scrutiny which the majority would apply to the test for gender-based classifications for equal protection purposes is not applicable. I would construe the statutes to permit a third-party father to intervene to assert his paternity in any action brought by another to challenge the presumption of paternity in the husband, *see* section 19-6-107(1)(b), C.R.S. 1973 (1978 Repl. Vol. 8), or to bring an independent action for that purpose once the presumption of the husband's paternity has been rebutted, *see* section 19-6-107(3), C.R.S. 1973 (1978 Repl. Vol. 8). The statutory scheme, as so construed, reflects a sensitive recognition and accommodation of the public policy considerations and private interests involved. In the circumstances here, where the child was conceived and born during the marriage and never lived with the third-party father, and where the husband and wife were not separated at the times of conception and birth, in my view the strong public policy of strengthening and preserving family ties would cause the classification to survive even that level of scrutiny which the majority concludes to be appropriate, i.e., that the classification has been shown to serve important governmental objectives and is substantially related to achievement of those objectives. *See Caban v. Mohammed, supra; see also People v. Green,* 183 Colo. 25, 514 P.2d 769 (1973).

## V.

From the conclusion that the class is not gender-based, it follows that the equal rights amendment of the Colorado Constitution[7] has no application.

---

[7] *Colo. Const.* Art. II, § 29. That section provides: "Equality of rights under the law shall not be denied or abridged by the State of Colorado or any of its political subdivisions on account of sex."

## VI.

The concurring opinion concludes that due process of law is denied to the third-party father by the Uniform Parentage Act, in contravention of *U.S. Const.* amend. XIV and *Colo. Const.* Art. II,§ 25.

As discussed in Part III, it is not at all certain that the third-party father has a constitutionally protected interest under the facts of the instant case. Those facts make this case very different from *Stanley v. Illinois, supra. See Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). If the third-party father has a constitutionally cognizable interest, I agree with the concurring opinion that the competing private and state interests must be weighed in determining whether due process of law requires that a hearing be accorded to the third-party father to permit him to attempt to rebut the presumption that the husband is the father. In light of the public policy interests in preserving and strengthening family ties and providing stable home environments for children, I cannot conclude that due process of law is denied to the third-party father in this case because he is precluded from determining his paternity unless and until the presumption of the husband's paternity is rebutted in an action brought by someone within the family unit. *See Quilloin v. Walcott, supra.*

It may be that factual circumstances could exist which would invite the recognition of an interest in a third-party father which would mandate an opportunity for hearing with respect to the presumption of the husband's paternity in order to accord due process of law to the third-party father.[8]  This is not such a case. The facts before the trial court reflect that both the mother and the third-party father were married to other persons when the child was conceived and born and that both marriages continued. The child has never lived with the third-party father, although for one and one-half years she visited in his home periodically and became acquainted with his older children. The child has always been in the custody of the mother and her husband and has been supported by them. The third-party father's only contacts with the child have been during the course of visits permitted by the mother. To me, the important criteria would be the duration and quality of the relationship of the parties, not the probability that the third-party father could in fact prove paternity.[9]

---

[8] Section 19-6-105(1)(d), C.R.S. 1973 (1978 Repl. Vol. 8), would create a presumption of paternity in any male person who receives the child into his home and openly holds out the child as his natural child. Whether this is sufficiently extensive to protect any constitutionally cognizable interest of a third-party father in all imaginable factual contexts we need not decide today.

[9] *See* Mr. Justice Stewart's dissent in *Caban v. Mohammed, supra,* in which he says, "Parental rights do not spring full blown from the biological connection between parent and child. They require relationships more enduring." 441 U.S. 380, 397, 99 S.Ct. 1760, 1771, 60 L.Ed.2d 297, 310 (1979). *See also In re Lisa R.,* 13 Cal.3d 636, 119 Cal.Rptr. 475, 532 P.2d 123, *cert. denied,* 421 U.S. 1014, 95 S.Ct. 2421, 44 L.Ed.2d 682 (1975).

A person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *accord, People v. Stage,* 195 Colo. 110, 575 P.2d 423 (1978); *People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975).

It may be objected that to draw a line between any factual circumstances in which a third-party father cannot be denied a hearing to challenge the presumption of the husband's paternity and factual circumstances in which a hearing for such purpose need not be permitted would be a difficult task. This is undoubtedly true. Litmus test certainty in application has never been the criterion for adoption of rules of constitutional adjudication. Development of limits of constitutional protections on the basis of case by case determinations is a traditional role of the courts. We should not shirk the task with respect to the issue involved here.

I would affirm the judgment of the juvenile court.