400 Mass. 12 (1987)
507 N.E.2d 736
R.R.K.
vs.
S.G.P.
Supreme Judicial Court of Massachusetts, Berkshire.
January 6, 1987.
May 14, 1987.
Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.
David O. Burbank for the plaintiff.
Robert M. Fuster for the defendant.
NOLAN, J.
On April 18, 1984, R.R.K. filed a complaint with the Probate and Family Court for Berkshire County. The complaint alleged that he is the father of a female child born to S.G.P. on July 23, 1981. R.R.K. requested that the court order that she allow R.R.K. visitation rights with the child. S.G.P.'s answer denied R.R.K.'s paternity and asserted as an affirmative defense that the child was conceived during her lawful marriage to her former husband. S.G.P. then moved to dismiss the complaint.
*13 On June 6, 1984, the judge allowed R.R.K.'s motion to order R.R.K., S.G.P. and the child to submit to a blood test to determine paternity. The judge also allowed R.R.K.'s motion that he, S.G.P. and the child undergo psychological evaluation.
After the results of the blood test and psychological examination were submitted to the judge, an order was entered in October, 1984, granting R.R.K. some visitation privileges during the pendency of the litigation. The order explicitly recognized that it was without prejudice to S.G.P. A few months later, in January, 1985, a hearing was held on R.R.K.'s motion for visitation rights. The judge ruled that R.R.K. be permitted to visit the child once a month. R.R.K. was also required to pay $25 a week as child support.
After our decision in P.B.C. v. D.H., 396 Mass. 68 (1985), cert. denied, 475 U.S. 1058 (1986), S.G.P. filed a motion to dismiss on the ground that R.R.K. lacked standing to have the court adjudicate his paternity claim. The motion was heard in December, 1985, and allowed in March, 1986. R.R.K. appeals from the dismissal of his complaint. We took the case on our own motion.
The motion to dismiss filed by S.G.P. appears to be based on Mass. R. Dom. Rel. P. 12(b)(6), which provides for dismissal of a complaint for failing to state a claim on which relief may be based. The motion to dismiss avers that the child is a child of the marriage of S.G.P. and her husband (not a party to the action) "being conceived [in] wedlock at a time [when S.G.P.] was having marital relations with her lawful husband." By this action, the motion continues, the plaintiff seeks to bastardize the child of the defendant's marriage to her husband.
The complaint must be examined to determine whether it is legally sufficient, i.e., whether the plaintiff can prove some set of facts in support of his claim which would entitle him to relief. Nader v. Citron, 372 Mass. 96, 98 (1977). In making his ruling, the judge must take the allegations of the complaint, as well as such inferences as may be drawn, to be true. Id.
In examining the complaint under these guidelines, we discover that the plaintiff says (after the necessary geographical *14 allegations) that S.G.P. gave birth to a child on a certain date, that he is the biological father of such child, that he has regularly and frequently visited the child, that S.G.P. now refuses to permit him to visit the child and that such visits are in the best interests of the child. We think that it was error to allow S.G.P.'s motion to dismiss.
We remand the case to the trial judge. He may make findings of fact and decide the case on the merits, or he may determine it appropriate for summary judgment and in this connection he may consider the affidavit of R.R.K. To assist the trial judge in whichever direction he decides to proceed, we make the following observations.
A guardian ad litem should be appointed for the child. Joinder of the former husband of S.G.P. as a party may be helpful but, if he continues to reside outside of the Commonwealth, the acquisition of jurisdiction and service of process may pose problems.
The case of P.B.C. v. D.H., 396 Mass. 68 (1985), is distinguishable. At the time of the commencement of that action the mother and her husband had remarried each other after their divorce and the child was part of an intact family. The husband in P.B.C. (unlike the former husband in the instant case) accepted the child and the child's birth certificate lists the husband as father. In the instant case, the former husband's name does not appear on the birth certificate. In the present case, the former husband has never recognized the child, and R.R.K. visited the child frequently until prohibited by S.G.P. The child called R.R.K. "Daddy." In P.B.C., we insisted that the holding was limited to the circumstances of that case.
For guidance to the trial judge in deciding on remand whether to allow a motion for summary judgment for which reliance is placed on the affidavit of R.R.K. or in deciding the case on the merits, we point out that the human leukocyte antigen white blood cell test which was ordered and completed in this case is not conclusive or even admissible without other evidence tending to show a sexual alliance between R.R.K. and S.G.P. Commonwealth v. Beausoleil, 397 Mass. 206, 220 n. 18 (1986). G.L.c. 273, § 12A.
*15 Finally, we speak to the issue of the presumption of legitimacy. The provenance of this presumption is the case of Goodright v. Moss, 2 Cowp. 591, 592 (1777), in which Lord Mansfield announced the rule that where legitimacy of a child born in lawful wedlock is in issue, "the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage." The rule has acquired the name of the author of the opinion and it has been extended to a child conceived as well as born during lawful wedlock. State v. Bowman, 230 N.C. 203, 204-205 (1949). Wigmore severely criticizes the rule. 7 J. Wigmore, Evidence (Chadbourn rev. 1978).
As early as 1861, this court announced that there is a legal presumption that a child born in lawful wedlock is legitimate but that such presumption may be rebutted by proof either that the husband had no access to the wife during the time when, by the course of nature, he could be the father of the child or, alternatively, that he was impotent at the time. Hemmenway v. Towner, 1 Allen 209, 209-210 (1861). See Taylor v. Whittier, 240 Mass. 514, 516 (1922) (impotence). Such proof must be beyond a reasonable doubt. Phillips v. Allen, 2 Allen 453, 454 (1861).
The case is remanded for further proceedings consistent with this opinion.
Judgment reversed.
LIACOS, J. (concurring).
While I agree that this case should be remanded for further proceedings, I write separately because I believe that the court has not offered adequate guidance to the judge on remand. The record of this case demonstrates, I think, the issuance of a number of orders without factual or legal basis. The court's silence on such matters, together with its reference to unproven facts in its efforts to distinguish the case of P.B.C. v. D.H., 396 Mass. 68 (1985), can only continue to mislead the trial judge as to his proper duties. We should address more directly the inadequacy of R.R.K.'s showing to rebut the presumption that a child conceived by S.G.P. during her marriage to another man was the legitimate child of that marriage.
*16 The presumption of legitimacy of a child born in wedlock is, as Chief Judge Cardozo wrote, "Potent, indeed, ... one of the strongest and most persuasive known to the law." Matter of Findlay, 253 N.Y. 1, 7 (1930). See also Eldridge v. Eldridge, 153 Fla. 873 (1944). The presumption of legitimacy is not limited to cases where the marriage is claimed or proved. It applies to every case where the question is at issue. Re Mattews Estate, 153 N.Y. 443 (1897).
The presumption that a child born in wedlock is legitimate is one of great antiquity. Several courts have noted that it was a maxim of the Roman law which the common law copied.[1]Estate of Cornelious, 35 Cal.3d 461, 464, appeal dismissed sub nom. Hall v. Taylor, 466 U.S. 967 (1984). Kennedy v. State, 117 Ark. 113 (1915). At one time, the presumption was conclusive. "If a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity." Matter of Findlay, supra. The presumption was applied with great rigor at early common law in order to protect children from the grave disabilities attaching to the status of illegitimacy. "According to the principles of the common law, an illegitimate child is filius nullius, and can have no father known to the law." Lessee of Brewer v. Blougher, 39 U.S. (14 Pet.) 178, 198 (1840).
Gradually, the inequity of past prejudices against illegitimate children became apparent.[2] The rule has been relaxed, and the *17 presumption has become rebuttable, although "there have been varying statements of the cogency of the evidence sufficient to repel it." Matter of Findlay, supra.
This court has held that a child born to a married woman is presumed to be the child of the mother's husband. Commonwealth v. Leary, 345 Mass. 59, 60 (1962). That presumption of legitimacy may not be rebutted, even in a civil case, "except on facts which prove, beyond all reasonable doubt, that the husband could not have been the father." Phillips v. Allen, 2 Allen 453, 454 (1861). In Taylor v. Whittier, 240 Mass. 514, 516-517 (1922), this court held that, to overcome the presumption of legitimacy of a child born in wedlock, it was necessary to prove "beyond all reasonable doubt" either that (1) the husband had no access to his wife during the time when, according to the course of nature, he could be the father of the child, or (2) the husband was impotent. "Mere proof of the wife's adultery while cohabiting with her husband is not enough." Sayles v. Sayles, 323 Mass. 66, 69 (1948). In Commonwealth v. Stappen, 336 Mass. 174 (1957), we recognized a third means to overcome the presumption of legitimacy: by a blood grouping test properly conducted by a qualified expert which definitely excludes the husband as the father.
In P.B.C. v. D.H., 396 Mass. 68, 71 (1985), cert. denied, 475 U.S. 1058 (1986), we extended the scope of the common *18 law presumption of legitimacy. We held that "a child conceived by a married woman is presumed to be the child of the man to whom the mother was then married even if the mother and the husband are divorced at the time of the child's birth" (emphasis in original). In my view, our holding in P.B.C. v. D.H. controls this case. I disagree with the effort of the court, drawing on dicta in P.B.C. v. D.H., to distinguish that case from the situation here presented. As we noted in P.B.C. v. D.H., our holding there "foster[ed] the important social policy of affording legitimacy to children whenever possible."[3]Id.
The same concerns expressed in P.B.C. should animate our review of R.R.K.'s claim here. There is no dispute that the child was conceived while her mother was married; therefore, the child is presumed to be legitimate. Accordingly, an issue implicit in this appeal is whether, on the record before us, R.R.K. had put forth sufficient evidence to prove "beyond all reasonable doubt" that the child is his illegitimate offspring. Obviously, on the record before us, we can make no such determination, and the court properly does not do so. Whether such evidence can be adduced is the question before the judge on remand.
Looking at the record thus far, however, I feel compelled to add that I believe that it was improper in the extreme for the motion judge to have ordered, on the basis of what was then before him, that S.G.P. and her child submit to psychological evaluation and to human leukocyte antigen (HLA) blood group testing pursuant to Mass. R. Civ. P. 35 (a), 365 Mass. 793 (1974). All that was before the motion judge when he allowed the plaintiff's motion to compel HLA testing and psychological evaluation was the unsworn, unverified complaint of the plaintiff. In her answer, the defendant had denied that the plaintiff was the father of her child.
*19 A motion for mental examination is addressed to the court's sound discretion and depends upon showing of good cause. Mass. R. Civ. P. 35, 365 Mass. 793 (1974). It has been noted that "more than any other mode of discovery, an examination [under Mass. R. Civ. P. 35] impinges directly upon the privacy and personality of the party being examined." J.W. Smith & H.B. Zobel, Rules Practice § 35.3, at 385 (1975). Such a motion should therefore be as detailed as possible. Smith & Zobel, supra at 384. The moving party "must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." Schlagenhauf v. Holder, 379 U.S. 104, 119 (1964). See G.L.c. 123, § 19. (1984 ed.). See also Commonwealth v. Gibbons, 378 Mass. 766, 773-774 (1979). In my view, the unsworn, unverified statement of the plaintiff here was insufficient to permit the motion judge to exercise that function.
Neither should the judge have ordered S.G.P. and her child to submit to HLA blood group testing on such a record. In Schmerber v. California, 384 U.S. 757, 768, 771 (1966), the United States Supreme Court emphasized the existence of probable cause to arrest the defendant to justify its holding that the extraction of a blood sample from a nonconsenting defendant did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. Not only was there no probable cause in this case; there was not even a verified complaint or affidavit on which the compulsory order for testing could be justified.[4]
*20 Further, the husband of S.G.P., presumed to be the child's father, has not been joined as a party to this action. The court might well have dismissed R.R.K.'s complaint pursuant to Mass. R. Dom. Rel. P. 12 (b) (7) for failure to join the husband as a necessary party under Mass. R. Dom. Rel. P. 19 (a). If R.R.K. sought a preliminary injuction, he would have to give notice to the husband as an adverse party. Mass. R. Civ. P. 65 (b) (1), 365 Mass. 832 (1974). A temporary restraining order might be granted without such notice "only if it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or his attorney can be heard in opposition." Mass. R. Dom. Rel. P. 65 (a). No such showing was made, yet an order for visitation rights to R.R.K. was issued.
The constitutional implications of the allowance of R.R.K.'s request for visitation rights bear further mention. In Normand v. Barkei, 385 Mass. 851, 853 (1982), we held that a man asserting that he is the father of an illegitimate child, and thus acknowledging his paternity, may seek an order from the Probate Court granting him visitation rights. We stated that "[t]he plaintiff has a right to visitation with the children if he is their father and if visitation is in their best interests." Id. at 852. There we considered the rights of a putative father to visit with a child whose mother was unmarried when the child was conceived. No presumption of legitimacy was applicable. Thus, Normand is not a basis for the interlocutory visitation order issued in this case. No threshold showing of a constitutionally based claim was established.
Courts which have considered claims similar to that of R.R.K. have split on the question whether putative fathers in the position of R.R.K. should be granted visitation rights. For example, in R. McG. v. J.W., 615 P.2d 666, 672 (Colo. 1980), the Supreme Court of Colorado, en banc, held that where "the statutory scheme allows a natural mother to seek a judicial declaration of paternity in the natural father in connection with a child born to the natural mother during her marriage to another, the equal protection guarantee of the federal and state *21 constitutions as well as the Colorado equal rights amendment require that a claiming natural father be accorded standing to file and proceed with his claim for a judicial declaration of paternity in himself with respect to a child born to the natural mother during her marriage to another."
By contrast, the Supreme Court of Delaware held in Petitioner F. v. Respondent R., 430 A.2d 1075 (Del. 1980), that the putative father of a child conceived and born during its mother's marriage to another man had no constitutionally protected interest in determination of his parental status for purposes of obtaining custody or visitation rights with respect to the child. Consequently, statutes denying the putative father standing to seek custody or visitation did not deprive him of due process or violate his right to equal protection under the State and Federal Constitutions. See Normand v. Barkei, supra at 852 n. 1.
A general proposition that emerges from the cases decided by other courts is that a putative father's rights to visit his illegitimate child depends on a factual, case by case determination of what is in the best interests of the child. See, e.g., Annot., 15 A.L.R.3d 887 (1967), and cases cited therein. In this regard, the existence or nonexistence of a substantial relationship between the putative father and child is relevant in evaluating both the rights of the parent and the best interests of the child. See Lehr v. Robertson, 463 U.S. 248, 266-267 (1983).[5]
The record in this case must be developed carefully to allow reasoned determination of what is in the best interests of the *22 child and what, if any, constitutional claim R.R.K. may have to visitation rights with that child.[6]
NOTES
[1] "Shakespeare was familiar with the rule, for he made reference to it in King John, act I, scene 1: `King John.  Sirrah, your brother is legitimate; Your father's wife did after wedlock bear him; And, if she did play false, the fault was hers; Which fault lies on the hazards of all husbands That marry wives.'" Estate of Cornelious, 35 Cal.3d 461, 464 (1984).
[2] Recent opinions of the United States Supreme Court have struck down State statutory distinctions based on legitimacy as violations of the equal protection clause of the Fourteenth Amendment. See, e.g., Pickett v. Brown, 462 U.S. 1 (1983); Mills v. Habluetzel, 456 U.S. 91 (1982); Trimble v. Gordon, 430 U.S. 762 (1977); Gomez v. Perez, 409 U.S. 535 (1973). See also Powers v. Wilkinson, 399 Mass. 650 (1987) (rejecting the common law rule that the word "issue" is presumed not to include illegitimate children).

Similarly, G.L.c. 209C, § 1, inserted by St. 1986, c. 310, § 16, effective July 12, 1986, states the legislative policy that "[c]hildren born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children."
These developments are in proper recognition that "[t]he status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual  as well as an unjust  way of deterring the parent. Weber v. Aetna Casualty & Sur. Co., 406 U.S. 164, 175 (1972).
Accordingly, the Supreme Court's consideration of the constitutional validity of statutory classifications based on illegitimacy "has been animated by a special concern for discrimination against illegitimate children." Pickett v. Brown, supra at 7.
[3] The presumption still is seen to promote "important social policies: preservation of the integrity of the family, protection of the welfare of children by avoiding the stigma of illegitimacy and keeping them off welfare rolls, and insurance of the stability of titles and inheritance." Estate of Cornelious, supra at 465.
[4] The limitations of HLA blood testing should also be noted. In Commonwealth v. Beausoleil, 397 Mass. 206, 219-220 (1986), we stated that "inculpatory blood test evidence establishing a likelihood of paternity equal to or greater than 95% should not be conclusive on the issue of paternity. It is merely some evidence of paternity which the jury must consider, along with all of the other evidence presented in making their determination." As the opinion of Justice O'Connor noted, "No test tends to prove a fact it assumes. The HLA test, therefore, has no relevancy to the question, typically the one critical question in a paternity case, whether the defendant had intercourse with the mother at a time and in circumstances that would explain the conception of the child." Commonwealth v. Beausoleil, supra at 227 (O'Connor, J., concurring in part and dissenting in part).
[5] As the Supreme Court noted in Lehr v. Robertson, supra at 261, "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause.... But the mere existence of a biological link does not merit equivalent constitutional protections." (Citations omitted.) In my view, the judge on remand should consider this principle in determining whether R.R.K. has a basis for claiming a constitutionally based right of visitation.
[6] It should be noted that G.L.c. 209C would deny standing to a plaintiff in R.R.K.'s position to seek to establish his paternity or visitation rights with regard to a child born while S.G.P. was married to another man. G.L.c. 209C, § 5(a). Pursuant to G.L.c. 209C, § 6(a), the husband of S.G.P., presumed to be the father of the child, would have to be joined as a party to this action. This proceeding is not governed by the provisions of G.L.c. 209C, because the statute went into effect on July 22, 1986, after the commencement of these proceedings. I make no comment on the constitutionality of the statute. I point to these provisions as evidence of the Legislature's policy pertaining to the sensitive issues raised by the matter before us.