**A.D., a minor child, and her Guardian Ad Litem, Richard C. Throndset, Defendants.**

**Civ. No. 920383.**

Supreme Court of North Dakota.

Sept. 8, 1993.

As Amended Sept. 15, 1993.

Michael L. Wagner (argued), Bismarck, for defendants and appellants.

Kimberly Ann Johnson (argued), Asst. State's Atty., Bismarck, for plaintiff and appellee; appearance by Beth Birdsall.

NEUMANN, Justice.

K.D. (Kelly, a pseudonym) and D.D. (Dean, a pseudonym) appeal from two orders entered by the District Court for Burleigh County in an action initiated by B.H. (Barry, a pseudonym) to determine the paternity of A.D. (Anna, a pseudonym). One order denied Kelly and Dean's motion for summary judgment. The other order compelled Kelly and Anna to undergo blood tests. We exercise supervision and reverse the orders.

In January 1991, Kelly and Dean were engaged to be married. Anna was conceived in March 1991. At that time, Kelly had sexual relations with both Dean and Barry. Although there is some dispute in the record as to whether the sexual relationship with Barry was consensual, Kelly admits that she had sexual intercourse with Barry around the time of Anna's conception. In May 1991, Kelly and Dean were married, this being the first marriage for both. Anna was born in December 1991, during the marriage of Kelly and Dean. Subsequent to Anna's birth, Barry obtained the legal services of the Regional Child Support Enforcement Unit to assist him in an action against Anna, Kelly, and Dean, to determine the paternity of Anna. Barry alleges that Anna is his child, and he moved the district court to order blood tests of Kelly and Anna to aid him in proving paternity. Kelly and Dean countered with a motion for summary judgment, contending that under North Dakota's Uniform Parent-

age Act, Chapter 14–17, N.D.C.C., Barry lacks standing to bring this action. The district court ordered the blood tests, and denied the motion for summary judgment. This timely appeal followed.

I.

■ Before we reach the merits of this matter, we must address the appealability of the orders from which Kelly and Dean appealed. Both are interlocutory orders, and ordinarily are not appealable because they are not final dispositions of the action on appeal. *See Vinje v. Sabot,* 477 N.W.2d 198, 199 (N.D.1991) (an "order denying summary judgment is interlocutory and is not appealable"); *Gillan v. Saffell,* 395 N.W.2d 148, 149 (N.D.1986) (a motion for summary judgment denied by an order in the trial court is interlocutory and not appealable to this Court); *Malony v. Cass County Court,* 301 N.W.2d 112, 113 (N.D.1980) (normally, "orders relating to pretrial discovery are by nature interlocutory and not appealable"); *Budge v. Anderson,* 146 N.W.2d 169, 170 (N.D.1966) (an order providing for the physical examination of a party is interlocutory and is not appealable).

■ However, there are some orders which are appealable to this Court even though they are not final dispositions of a case. Our case law in this area has evolved over the past few years, and currently, to qualify for appellate review, an order must satisfy a two-step process. *See, e.g., Nesvig v. Anderson Bros. Constr. Co.,* 490 N.W.2d 478 (N.D.1992); *Ceartin v. Ochs,* 479 N.W.2d 863 (N.D.1992); *Gissel v. Kenmare Township,* 463 N.W.2d 668 (N.D.1990); *Peterson v. Zerr,* 443 N.W.2d 293 (N.D.1989); *Sargent County Bank v. Wentworth,* 434 N.W.2d 562 (N.D.1989). First, the order must fit within the laundry list of appealable orders codified in Section 28–27–02, N.D.C.C.[1] *Gast Constr. Co. v. Brighton Partnership,* 422 N.W.2d 389, 390 (N.D.1988). If it is not one of the types of orders found in the statute, our inquiry ends. We need go no farther because we would lack jurisdiction, and the appeal would be dismissed. *Id.* The second step involves compliance with Rule 54(b), N.D.R.App.P.[2] If Rule 54(b) certification is absent, we would also lack jurisdiction, and the appeal would be dismissed. *Id.*

■ Kelly and Dean argue that the orders fall within the first subsection of Section 28–

1. Section 28–27–02, N.D.C.C., provides:

 *"What orders reviewable.* The following orders when made by the court may be carried to the supreme court:
 1. An order affecting a substantial right made in any action, when such order in effect determines the action and prevents a judgment from which an appeal might be taken;
 2. A final order affecting a substantial right made in special proceedings or upon a summary application in an action after judgment;
 3. An order which grants, refuses, continues, or modifies a provisional remedy, or grants, refuses, modifies, or dissolves an injunction or refuses to modify or dissolve an injunction, whether such injunction was issued in an action or special proceeding or pursuant to the provisions of section 35–22–04, or which sets aside or dismisses a writ of attachment for irregularity;
 4. An order which grants or refuses a new trial or which sustains a demurrer;
 5. An order which involves the merits of an action or some part thereof;
 6. An order for judgment on application therefor on account of the frivolousness of a demurrer, answer, or reply; or
 7. An order made by the district court or judge thereof without notice is not appealable, but an order made by the district court after a

hearing is had upon notice which vacates or refuses to set aside an order previously made without notice may be appealed to the supreme court when by the provisions of this chapter an appeal might have been taken from such order so made without notice, had the same been made upon notice."

2. Rule 54(b), N.D.R.Civ.P., reads:

 *"Judgment Upon Multiple Claims or Involving Multiple Parties.* If more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or if multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of that determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties does not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

27–02, N.D.C.C., because the orders affect the substantial rights of Kelly, Dean, and Anna, as a family unit. We agree with the assertion that the order compelling blood tests affects the family's substantial rights. Parenting and the family unit are important considerations, protected, at least in part, by the United States Constitution. The high court has said: "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Michael H. v. Gerald D.*, 491 U.S. 110, 124, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91 (1989) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977)). If allowed, the blood tests possess the capability to pierce the protected realm of the family unit composed of Kelly, Dean, and Anna. The blood tests could destroy the very foundation of the family structure they have built. Therefore, we are satisfied that the blood test order threatens the protected family unit, affecting Kelly and Dean's substantial rights. The first step of the appealability analysis is satisfied.

 It is the second step which presents the problem for Kelly and Dean. There has been no Rule 54(b) certification in this case. Although Kelly and Dean moved the district court to certify the orders for appeal, it denied their motion. While that denial may have been an abuse of discretion, without a Rule 54(b) certification, we lack jurisdiction over this appeal.[3] Thus, under normal circumstances, this appeal should be dismissed. However, the facts presented in this case are not normal, they are extraordinary, and we have other means by which we may exercise jurisdiction in this case.

 This Court has authority to exercise its original jurisdiction by issuing a supervisory writ. N.D. Const. art. VI, § 2. We will do so cautiously, and only in extraordinary circumstances. "Exercise of our original, supervisory jurisdiction is discretionary with this court, and that jurisdiction is exercised rarely and cautiously." *Jane H. v.*

---

**3.** As previously mentioned, case law in this area has evolved over the past few years. Prior to cases such as *Gillan v. Saffell*, 395 N.W.2d 148 (N.D.1986) and *Gast Constr. Co. v. Brighton Partnership*, 422 N.W.2d 389 (N.D.1988), this Court would often times end its discussion of the appealability of an order after we found that the order fit neatly into Section 28–27–02, N.D.C.C. However, today, such an analysis is incomplete, and found only in cases that predate the " 'shift in our appellate procedure regarding the applicability of Rule 54(b) certification to orders that are appealable pursuant to Section 28–27–02, N.D.C.C.' " *Peterson v. Zerr*, 443 N.W.2d 293, 296 (N.D.1989) (quoting *Harmon Motors v. First Nat'l Bank & Trust*, 436 N.W.2d 240, 241 (N.D. 1989)). As a result of the changes occurring in our more recent case law, "our appellate procedure has now evolved into a bright line requiring the finality of Rule 54(b) certification for civil appeals involving multi-claim or multi-party actions." *Sargent County Bank v. Wentworth*, 434 N.W.2d 562, 564 n. 2 (N.D.1989).

It might appear at first blush that Rule 54(b) has no application to the present facts, where there are no cross-claims, counter-claims, or third-party claims, and there are only two parties disputing one thing—paternity. However, this Court has determined that " 'claims' is used in the general sense in Rule 54(b) to include 'issues.' " *Id.* at 564. In this case, the order compelling blood tests does not dispose of the remaining issue of paternity. It is merely a discovery order facilitating the production of evidence. Thus, there are remaining "issues" yet to be adjudicated below. Rule 54(b) applies.

We recognize that the federal system utilizes a more strict view of the applicability of Rule 54(b). *See Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (the federal Rule 54(b), concerning appeals from actions involving multiple claims or multiple parties, does not apply to single claim actions). However, we explained the differences in the approach to Rule 54(b) as follows:

"We also recognize the important distinction between the federal and North Dakota procedure for promulgating rules of procedure. Under the federal procedure, the United States Supreme Court has the power to recommend rules of civil procedure to Congress, but the rules do not take effect until ninety days after they are reported to Congress. 28 U.S.C.A. § 2072. Thus, on the federal level Congress essentially makes the final decision on enacting rules of civil procedure, including Rule 54(b), as well as what orders are appealable. In contrast the North Dakota Constitution, Art. VI, § 3, authorizes the North Dakota Supreme Court to 'promulgate rules of procedure, including appellate procedure, to be followed by all the courts of this state.' Thus, in this state the Legislature determines what orders are appealable but this court has the final authority on rules of procedure for the courts, including Rule 54(b)."

*Sargent County Bank v. Wentworth*, 434 N.W.2d at 564 n. 2.

*Rothe*, 488 N.W.2d 879, 881 (N.D.1992). *See also Odden v. O'Keefe*, 450 N.W.2d 707 (N.D. 1990). Additionally, we will grant a supervisory writ only to prevent injustice in cases where the aggrieved parties have nowhere else to turn. "Our superintending control over inferior courts is used to prevent injustice in extraordinary cases where no other remedy is adequate or allowed by law." *Id.* at 708. As mentioned above, we believe that the blood test order affects the substantial rights of the family involved. The tests have the potential of destroying the family unit. To wait until final judgment to appeal the discovery order may well be too late. The irreparable damage may already have taken place. Without a supervisory writ, Kelly and Dean have no other adequate remedy allowed by law. Therefore, even though no application for a supervisory writ has been made to this Court, we conclude that the orders "so affect[ ] the fundamental merits of the case that we will consider the appeal as a request to exercise our supervisory jurisdiction and, exercising our discretion, we will consider the issues on their merits." *Thompson v. Goetz*, 455 N.W.2d 580, 583 (N.D.1990). *See also Vorachek v. Citizens State Bank*, 461 N.W.2d 580, 584 (N.D.1990); *Garrison Memorial Hosp. v. Rayer*, 453 N.W.2d 787, 788 (N.D.1990).

## II.

 Under our legislative enactments, Barry lacks the required standing to bring an action disputing the paternity of Anna, a child born during the marriage of Kelly and Dean. The legitimacy and paternity of children are addressed by the North Dakota Legislative Assembly in the Uniform Parentage Act (UPA) and elsewhere in the Code. Outside of the UPA, in a chapter entitled "Domestic Relations and Persons," it states: "All children born in wedlock are presumed to be legitimate." Section 14–09–01, N.D.C.C. Standing to dispute the presumption of legitimacy is also contained within that chapter, and it reads: "The presumption of legitimacy can be disputed only by the *husband or wife, or the descendant of one or both of them.* Illegitimacy in such case may be proved like any other fact." Section 14–09–03, N.D.C.C. (emphasis added). Thus, under these general statutes, Barry clearly has no standing to rebut the presumption of Anna's legitimacy, and in turn, Dean's paternity of Anna.[4]

The UPA statutes also deny Barry standing to bring this action. First, we must study the presumption statute, which reads:

"*Presumption of paternity.*

1. A man is presumed to be the natural father of a child if:

a. He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within three hundred days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court;

b. Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and:

(1) If the attempted marriage could be declared invalid only by a court, the

---

4. Barry attempts to negate the effect of the above statutes by relying on *State v. Coliton*, 73 N.D. 582, 17 N.W.2d 546 (1945). In *Coliton*, we held that the term "wedlock" referred to the state of marriage or status between the husband and wife, but did not include the status of the wife and her "paramour." *Id.* 17 N.W.2d at 549. Therefore, we concluded that a child born to a married woman may still be born "out of wedlock." *Id.* Barry tries to argue that Anna was born "out of wedlock," and therefore, cannot be presumed legitimate. We find Barry's reliance on *Coliton* unpersuasive. *Coliton* was decided prior to the passage of the UPA. In addition, Barry overlooks the fact that the action in *Coli-* *ton* was initiated by the State on behalf of the wife, the child's mother. The standing statute in existence at the time of *Coliton* was very much like the statute today, in which only the husband, wife, or descendants have standing to rebut the presumption of legitimacy. The action in *Coliton* therefore was brought on behalf of one with standing under the applicable statute. It was not brought on behalf of Mr. Coliton, the outsider who was not a party to the marriage, and whose status was therefore comparable to Barry's in the present case. The *Coliton* case did not grant standing to Mr. Coliton, and it does not grant standing to Barry.

child is born during the attempted marriage, or within three hundred days after its termination by death, annulment, declaration of invalidity, or divorce; or

(2) If the attempted marriage is invalid without a court order, the child is born within three hundred days after the termination of cohabitation;

c. After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and:

(1) He has acknowledged his paternity of the child in writing filed with the division of vital statistics of the state department of health and consolidated laboratories;

(2) With his consent, he is named as the child's father on the child's birth certificate; or

(3) He is obligated to support the child under a written voluntary promise or by court order;

d. While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child;

e. He acknowledges his paternity of the child in a writing filed with the division of vital statistics of the state department of health and consolidated laboratories, which shall promptly inform the mother of the filing of the acknowledgment, and she does not dispute the acknowledgment within a reasonable time after being informed thereof, in a writing filed with the division of vital statistics of the state department of health and consolidated laboratories. If another man is presumed under this section to be the child's father, acknowledgment may be effected only with the written consent of the presumed father or after the presumption has been rebutted; or

f. If genetic tests show that he is not excluded and the statistical probability of his parentage is ninety-five percent or higher.

2. A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree. establishing paternity of the child by another man."

Section 14–17–04, N.D.C.C.

■ It is clear from the evidence set forth in the record on appeal that, at the present time, Barry does not fit into any of the above provisions. Thus, he is currently not the presumed father of Anna. Instead, Dean is the presumed father of Anna because she was born during Dean's marriage to Kelly, fitting neatly into subdivision a of subsection 1 of the statute.

■ There is also a statute within the UPA that limits which individuals have standing to bring actions to determine the father and child relationship. In relevant part it provides:

*"Determination of father and child relationship—Who may bring action—When action may be brought.*

1. A child, his natural mother, or a man presumed to be his father under subdivision a, b, or c of subsection 1 of section 14–17–04, may bring an action:

a. At any time for the purpose of declaring the existence of the father and child relationship presumed under subdivision a, b, or c of subsection 1 of section 14–17–04; or

b. For the purpose of declaring the nonexistence of the father and child relationship presumed under subdivision a, b, or c of subsection 1 of section 14–17–04 only if the action is brought within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five years after the child's birth. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party.

2. Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship

presumed under subdivision d, e, or f of subsection 1 of section 14–17–04."

Section 14–17–05, N.D.C.C.

Barry lacks standing to bring an action to determine a father and child relationship under subsection 1 of the above statute because he is not the mother, child, or, as previously decided, the presumed father. Therefore, he is forced to try to obtain standing under subsection 2 of the statute. He does this by arguing that he is an "interested party," as the subsection requires. But that subsection also requires Barry to prove that the existence of a father and child relationship is *presumed* under subdivision d, e, or f of subsection 1 of Section 14–17–04. This he cannot do.

■ Barry concentrates exclusively on fitting into subdivision f of subsection 1 of Section 14–17–04. He argues that the blood tests, *if* positive to his cause, would allow him standing to rebut the presumption of Dean's paternity of Anna. The district court was convinced by this argument, but we believe it is fundamentally flawed. Barry cannot bootstrap his standing argument in this manner. One must have standing to *commence* an action, *see Bronner v. Exchange State Bank*, 455 N.W.2d 289, 290 (Iowa Ct.App.1990). Therefore, in order for Barry to have had standing as an "interested party" under Sections 14–17–05(2) and 14–17–04(1)(f), it would have been necessary for the requisite genetic test results to have been in existence when this action was commenced. They were not. One cannot commence an action without standing, based only on the hope that standing may later materialize. That is contrary to law and to the plain language and meaning of the statutes. There must be genetic tests already in existence which satisfy the statistical qualifications of the statute. Without the requisite test results, an individual like Barry cannot bring such an intrusive action, disrupting an established family, hoping that tests ordered by the court will subsequently vest him with standing to proceed. Too much irreparable damage will have occurred to the family in the meantime; the potential for abuse is too great.

Barry, anticipating his standing problem, asserts that if North Dakota's statutes are construed to deny him standing, then they also deny him his equal protection rights under the Fourteenth Amendment of the United States Constitution. Because of this alleged constitutional violation, he argues that the statutes should be ineffective. We disagree.

■ As we have stated before, "[o]ur standard of review for analyzing equal protection claims depends on the right allegedly infringed upon by the challenged legislative classification." *Kavadas v. Lorenzen*, 448 N.W.2d 219, 221 (N.D.1989) (state constitution equal protection analysis). We find this applicable to both state and federal equal protection analyses. Generally, when a state statute regulating social or economic matters is challenged on federal equal protection grounds, it is reviewed under the rational basis standard. *E.g., Best Products Co. v. Spaeth*, 461 N.W.2d 91, 96 (N.D.1990) (analyzing state statute under both state and federal constitutions). The legislative classification is upheld "unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose." *Kadrmas v. Dickinson Public Schools*, 402 N.W.2d 897, 902 (N.D.1987), *aff'd*, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

■ There are two exceptions to this general rule. The first exception occurs when a challenged statute interferes with a fundamental right or discriminates against an inherently suspect class such as race. In such a case, this court will apply strict scrutiny. *E.g., Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421, 425 (1984); *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621 (N.D.1977) (analysis of statutory classifications under both state and federal constitutions). In order to pass strict scrutiny, a statute must be "justified by a compelling governmental interest and must be 'necessary ... to the accomplishment' of their legitimate purpose." *Palmore*, 466 U.S. at 432–33, 104 S.Ct. at 1882, (citing *McLaughlin v. Florida*, 379 U.S. 184, 196, 85 S.Ct. 283, 290–91, 13 L.Ed.2d 222 (1964)); *State ex rel. Olson*, 259 N.W.2d at 621. The second exception occurs when a challenged statute infringes upon an important substan-

tive right such as gender or illegitimacy, in which case we apply an intermediate standard of review. *E.g., Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). This intermediate standard of review requires that the statute be substantially related to a sufficiently important governmental interest. *E.g., Cleburne*, 473 U.S. at 432, 105 S.Ct. at 3249.

■ Barry's contention that the statutes discriminate against him on the basis of his gender fails. This federal equal protection analysis has two levels. At the first level we address the differential treatment of men and women under sections 14–17–04 and 14–17–05, N.D.C.C. As stated above, gender-based classifications are not ipso facto invalid; they are valid if they meet the requirements of intermediate review. The statutes pass this intermediate level of scrutiny. We agree with the Wyoming Supreme Court's analysis of gender-based classifications of this nature. *See A v. X, Y, and Z*, 641 P.2d 1222 (Wyo.1982), *cert. denied*, 459 U.S. 1021, 103 S.Ct. 388, 74 L.Ed.2d 518 (1982).

"The classification here made is not 'entirely unrelated to any differences between men and women.' The differences are the very foundation of the classification. Here, they are obvious. The woman carries the child through pregnancy. When born of her, the fact of motherhood is obvious. Not so the man. The proof of fatherhood, or the proof of the lack thereof, must come from an external source. The entire classification within the act is premised on this basic and obvious distinction, it is not invidious, but 'realistically reflects the fact that the sexes are not similarly situated' in the circumstances. Men do not bear children and give birth to them.

Furthermore, to word the enactment without gender classification would result ... [in] a determination of the existence or nonexistence of a presumed mother in addition to that of a presumed father. Such result would be an absurdity. Nature identifies the mother at the time of birth. There is no need to engage in presumptions."

*Id.* at 1225 (citations omitted). As stated above, parenting and the family unit are important considerations worthy of constitutional protection. *See also Michael H. v. Gerald D.*, 491 U.S. 110, 123, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91 (1989) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."). The North Dakota statutes are substantially related to this important governmental interest of protecting the family unit. Not only mothers, but presumed fathers as well have standing to initiate paternity proceedings. Section 14–17–04, N.D.C.C.

■ The second level of this equal protection review is analysis of the classification of those men who have standing to bring paternity actions, and those men without standing. The determination of standing under section 14–17–05 is not gender-based; it is presumption-based. *See also Jack v. Jack*, 796 S.W.2d 543, 550 (Tex.Ct.App.1990) (marriage-based classification distinguished between those included and those excluded from the family unit), *reh'g denied*. Since this legislative classification is neither inherently suspect, nor does it infringe upon fundamental or important substantive rights, in order to pass constitutional muster all that is required is that it pass the rational basis test. We conclude that the classification is rationally related to the legitimate legislative goal of protecting the family unit, and therefore does not violate equal protection.

■ Barry's circumstances are distinguishable from those of the putative father in *R. McG. v. J.W.*, 200 Colo. 345, 615 P.2d 666 (1980) (serological test results 98.89 percent). The distinction here is between any male who may claim a sufficient connection to the child to be termed a presumptive father under section 14–17–04, as opposed to a male who has no connection with the child other than his naked claim that he had sexual intercourse with the child's mother. The North Dakota legislature's purpose in making the distinction was to provide standing to any claiming father who has also enjoyed virtually any aspect of a parent-child relationship or who has in his possession strong

proof of a biological link in the nature of genetic testing, while at the same time protecting families from the disruption, the trauma, and the destructive pain that would result if standing were granted to any interloper who could claim nothing more than a single sexual contact.

Barry's reliance on *R. McG.*, 615 P.2d 666, and upon concurring and dissenting opinions in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), is misplaced. In each of those cases the claiming father already had in his possession genetic test results which showed a probability of paternity in excess of 95 percent. In *Michael H.*, the child had also lived with him for a time when she was less than a year old, and Michael H. openly held the child out as his own. 491 U.S. at 110, 109 S.Ct. at 2333. Under North Dakota law, both R. McG. and Michael H. would be presumptive fathers, and would have standing to bring their actions. Barry, on the other hand, has no such claim to any aspect of a parent-child relationship, and no such proof of a biological link.[5] He is a mere interloper, who for whatever reason, threatens without justification the foundations of Anna's family. We find his constitutional argument without merit.

■ Remaining persistent, Barry tries to distinguish *Michael H.*, and various other

cases relied on by Kelly and Dean, by pointing out that the time of conception in those cases and this case is different. Notably, in *Michael H.* and various other cases, the time of conception occurred *during the marriage;* whereas in this case, conception occurred *before the marriage.* Under our statutes, we find this to be a distinction without a difference. The UPA is completely silent regarding the time of the child's conception. The UPA statutes only address themselves to the time of the child's birth. In this instance, there is no dispute that birth occurred *during the marriage.* Additionally, the statutes outside of the UPA are equally silent as to the time of conception. Thus, under North Dakota's statutory scheme concerning the paternity and legitimacy of children, the time of birth is the primary factor to be considered, not the time of conception.

Barry has provided this Court with several cases in which individuals in his position have been granted standing to bring suits to rebut the presumption of paternity of the husband, and establish their own. While it may be interesting to see what other jurisdictions have done, most of the authority cited is not beneficial to our discussion here. Barry has cited cases from jurisdictions that have not adopted the UPA or any recognizable equivalent. Because this case is controlled by the

**5.** We distinguish this case from those relied upon by the dissent. In *Kelly v. Cataldo*, 488 N.W.2d 822 (Minn.Ct.App.1992), *review denied* (1992), the facts suggest that the claiming father had begun to establish a relationship with the child, and blood tests were in existence. The Minnesota Court of Appeals specifically stated that the case before it did not address the "issue which arises when a proceeding such as this is initiated by a man who shows reason to believe testing will demonstrate his presumptive parenthood but who has no present evidence of genetic testing." *Id.* at 828. In *County of Orange v. Leslie B.*, 14 Cal.App.4th 976, 17 Cal.Rptr.2d 797 (1993), it was the putative father who was appealing an order of paternity. The facts of that case included the existence of both blood tests, and a parent-child relationship. *Id.* In the case of *Matter of Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989), the Kansas Supreme Court was faced with two competing presumed fathers; and once again blood tests and a relationship were already in existence. In the case of *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990), the court held that "[t]he existence of a substantial parent-child

relationship is . . . the controlling factor in determining whether [the putative father] may pursue his claim." *Id.* 550 N.E.2d at 372. In the case of *Adoption of Kelsey S.*, 1 Cal.4th 816, 4 Cal. Rptr.2d 615, 823 P.2d 1216 (1992), the court addressed the constitutionality of a state adoption statute which only allowed consent from presumed fathers. The threshold question was whether the putative father had demonstrated a sufficient commitment to his parental responsibilities by doing all that he reasonably could under the circumstances. *Id.* 4 Cal.Rptr.2d at 636, 823 P.2d at 1237. In the case of *In re J.W.T.*, No. D-1742, 1993 WL 233448 (Tex. June 30, 1993), in addition to existing blood tests, not only were there unsuccessful attempts to maintain contact with the mother and child, but the claiming father had also helped to arrange for prenatal care. Finally, *Michael M. v. Giovanna F.*, 5 Cal.App.4th 1272, 7 Cal.Rptr.2d 460 (1992), a case similar in many respects to our case, is distinguishable in that the putative father had clearly and consistently demonstrated his interest in forming a relationship with the child, and all such attempts had been thwarted by the mother.

statutes mentioned previously, cases from other jurisdictions without similar statutes or rules do not help us in our task. Instead, cases from jurisdictions which have adopted the UPA or its equivalent are most helpful, and provide us with a more applicable guide. *See, e.g., Ex parte Presse*, 554 So.2d 406, 411 (Ala.1989) (the Court could not "accept the proposition that [its] Legislature, in adopting the UPA, intended for a third party to be able to assert his paternity, to the exclusion of a man who was married to the child's mother"); *A v. X, Y, and Z*, 641 P.2d 1222, 1223 (Wyo.1982) (the UPA statute conferred no standing on the putative father to establish his paternity of a child born in wedlock to the mother and her husband, the presumed father; and, as so construed, the statute did not deny due process or equal protection rights).

### III.

■ Lastly, we feel compelled to address the issue of the presence of the Regional Child Support Enforcement Unit in this matter as counsel for Barry. It is our understanding, when reading Chapter 75 of the North Dakota Administrative Code, and Chapter 7 of the Federal Social Security Act (42 U.S.C.A. §§ 651 *et seq.*), that the Unit is to become involved when there is a demand for child support. We do not find such a demand in this case. Instead, we see the Unit, a governmental agency, assisting an individual who lacks standing under the applicable statutes. It has facilitated his intrusion into the sanctity of a family which has made no bid for financial assistance, and which is clearly content to be a self-sufficient family unit. The Unit's presence in this case seems to us to be out of place. The Unit's energy is to be best spent assisting those who are in need of child support, and pursuing those who will not pay child support. This was the clear intention of the creators of the Unit.

For the foregoing reasons, we exercise supervision, and we reverse the orders of the District Court for Burleigh County, denying summary judgment and ordering blood tests. We direct entry of judgment of dismissal for the defendants, and we assess costs against Barry.

VANDE WALLE, C.J., and SANDSTROM and LEVINE, JJ., concur.

MESCHKE, Justice, dissenting.

Because I believe that the majority opinion avoids important legislative history and constitutional precedents, misconstrues the Uniform Parentage Act, and misapplies standing, I respectfully dissent.

### 1. *Constitutional footings*

Some functional family relationships, as well as formal family values, deserve and receive constitutional recognition and procedural due process:

> The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923), "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942), and "[r]ights far more precious ... than property rights," *May v. Anderson*, 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra*, [262 U.S.], at 399 [43 S.Ct. at 626], the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra*, [316 U.S.], at 541 [62 S.Ct. at 1113], and the Ninth Amendment, *Griswold v. Connecticut*, 381 U.S. 479, 496 [85 S.Ct. 1678, 1688, 14 L.Ed.2d 510] (1965) (Goldberg, J., concurring).

Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony.... *Levy v. Louisiana*, 391 U.S. 68, 71–72 [88 S.Ct. 1509, 1511, 20 L.Ed.2d 436] (1968). "To say that

the test of equal protection should be the 'legal' rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such 'legal' lines as its chooses." *Glona v. American Guarantee Co.,* 391 U.S. 73, 75–76, 88 S.Ct. 1515, 1516, 20 L.Ed.2d 441 (1968).

*Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972) (denial to unwed father of hearing on fitness, accorded to all other parents whose custody of their children is challenged by the State, constitutes a denial of equal protection of the laws).

These constitutional footings led directly to the design of the Uniform Parentage Act.

### 2. Uniform act

In the aftermath of *Stanley v. Illinois,* the National Conference of Commissioners on Uniform State Laws drafted and recommended the Uniform Parentage Act (U.P.A.) in 1973, "at a time when the states need new legislation on this subject because the bulk of current law on the subject of children born out of wedlock is either unconstitutional or subject to grave constitutional doubt." Prefatory Note to Uniform Parentage Act, 9B U.L.A. 287 (1987).

> [T]he substance of the Act ... is expressed in the first two sections. The remainder of the Act is largely concerned with the *sine qua non* of equal legal rights—the identification of the person against whom these rights may be asserted. In the context of the child born out of wedlock that person is the father....
>
> In order to identify the father, the Act first sets up a network of presumptions which cover cases in which proof of external circumstances (in the simplest case, marriage between the mother and a man) indicate a particular man to be the probable father. While perhaps no one state now includes all these presumptions in its law, the presumptions *are* based on existing presumptions of "legitimacy" in state laws and do not represent a serious depar-

ture. Novel is that they have been collected under one roof. All presumptions of paternity are rebuttable in appropriate circumstances.

> The ascertainment of paternity when no external circumstances presumptively point to a particular man as the father are the next major function of the Act. Noteworthy is the pre-trial procedure envisaged by the Act which, the Committee expects, will greatly reduce the current high cost and inefficiency of paternity litigation.

Prefatory Note, 9B U.L.A. at 289 (emphasis original). The Uniform Parentage Act was enacted by the North Dakota Legislature in 1975. 1975 N.D.Laws, ch. 130; NDCC ch. 14–17. As the Prefatory Note stresses, "the substance of the Act" is expressed, for this case, in NDCC 14–17–02: "The parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents."

This legislative history,[1] together with sections 26 and 29 of the recommended Act, indicates that the U.P.A. was intended to subordinate the presumptions about paternity in existing state law by collecting them "under one roof." Also, NDCC 14–17–25 (U.P.A. 26) says:

> *Uniformity of application and construction.* This chapter must be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.

*See also Zuger v. North Dakota Ins. Guar. Ass'n,* 494 N.W.2d 135, 138 (N.D.1992); NDCC 1–02–13 (uniform laws interpreted uniformly to effect purposes).

In section 29, the U.P.A. recommended repeal of any then existing parentage act. 9B U.L.A. at 344. However, the only statute expressly repealed by the 1975 North Dakota enactment was NDCC ch. 32–36, the 1922 Illegitimacy Act. 1975 N.D. Laws, ch. 130, § 28. The existing presumptions about paternity in NDCC 14–09–01, 14–09–02, and

---

1. Official commentary for a uniform act is legislative history. 2B Sutherland Stat. Const. § 52.05 (5th ed. 1992).

14–09–03, as well as in NDCC 31–11–02(4), derived from the Field Code and territorial law, were not directly displaced. *See* Revised Codes of the Territory of Dakota, Civil Code §§ 86, 87, and 88 (1877). Inexplicably, these old presumptions were not expressly repealed, even though they and related presumptions were now "collected under one roof."

Without noticing or reconciling this legislative intention to replace the existing presumptions with rebuttable ones, the majority opinion makes them controlling over the remodeled ones "collected under one roof" in the most recent enactment. *See* NDCC 1–02–09.1 (if amendments are irreconcilable, the latest enactment prevails). Therefore, I disagree with the majority's construction of the U.P.A.. In my opinion, the prior presumptions should be reconciled with the latest enactment that makes all of the presumptions rebuttable.

If enactment of the U.P.A. in North Dakota did not implicitly repeal the prior presumptions in NDCC 14–09–01, 14–09–02, and 14–09–03 that were virtually indisputable, at least their remodeling under "one roof" made them rebuttable. NDCC 14–17–04(2) directs that all presumptions now "may be rebutted in an appropriate action...."

### 3. More constitutional standing

After *Stanley v. Illinois,* the United States Supreme Court continued to develop the constitutional recognition of biological fathers. *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (statute allowing adoption of child born out of wedlock not violative of Due Process Clause where unwed father never legitimated the child and did not seek visitation rights until after adoption petition filed); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (statute giving right to unmarried mother, but not to unmarried father, to block adoption by withholding consent, violated Equal Protection Clause); *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (unwed father not entitled to notice of child's adoption proceedings where father had not made prompt effort to establish a relationship with child).

Recently, in *Adoption of K.A.S.,* 499 N.W.2d 558, 562 (N.D.1993), we recognized the "fundamental nature of a parent's rights to nurture and rear his or her child":

> In examining the private interests at stake, the *Lassiter* [*v. Dept. of Social Services of Durham County,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) ] Court underscored the fundamental nature of a parent's rights to nurture and rear his or her child:
>
> > "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 [ (1972) ]." *Lassiter, supra,* 452 U.S. at 27, 101 S.Ct. at 2159–2160 [1981].

Later, Justice Brennan summarized the direction of the decisions:

> [A]lthough an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. "When an unwed father demonstrates a full commitment to the responsibilities of parenthood *by 'com[ing] forward to participate in the rearing of his child,'* ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he 'act[s] as a father toward his children.'" *Lehr v. Robertson, supra,* [463 U.S.], at 261 [103 S.Ct., at 2993], quoting *Caban v. Mohammed, supra* [441 U.S.], at 392, 389 [99 S.Ct., at 1768, 1766 n. 7.] n. 7. This commitment is why Mr. Stanley and Mr. Caban won; why Mr. Quilloin and Mr. Lehr lost; and why Michael H. should prevail today. Michael H. is almost certainly Victoria D.'s natural father, has lived with her as her father, has contributed to her support, and *has from the beginning sought to strengthen and maintain his relationship with her.*

*Michael H. v. Gerald D.,* 491 U.S. 110, 142–43, 109 S.Ct. 2333, 2352, 105 L.Ed.2d 91

(1989) (Justice Brennan, dissenting) (emphasis added) (footnote omitted). From the beginning in this case, by coming forward soon after the birth of Anna, Barry has demonstrated his commitment to his child and to participating in her parenting.

#### 4. Non-uniform amendments

In 1989, the North Dakota Legislature modified several provisions of our Uniform Parentage Act. 1989 N.D.Laws, ch. 148, §§ 29 through 34, and 36. Like a modification made by a few other states, although not recommended by the Uniform Commissioners (see 9B U.L.A., 1993 Cumulative Annual Pocket Part at 7–8), a sixth presumption was added to NDCC 14–17–04(1): "A man is presumed to be the natural father of a child if: ... (f) If genetic tests show that he is not excluded and the statistical probability of his parentage is ninety-five percent or higher."

Additionally, these amendments expanded standing in subsection 2 of NDCC 14–17–05:

Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under subdivision d [received into his home and openly held out as his child], e [written acknowledgement], or f [genetic test results ] of subsection 1 of section 14–17–04.

(emphasis shows amendment). Also, NDCC 14–17–10, 14–17–11, and 14–17–12 were amended to authorize genetic tests of other tissues besides blood.[2]

The majority opinion's interpretation, that the genetic tests need to be in existence in order to bring suit, is plausible if we only consider the original design of the Uniform Parentage Act, and the context of NDCC 14–17–05 as enacted. In the context of the non-uniform amendments, however, and in the light of the constitutional problems, I believe that the majority's construction is incorrect.

"The court may, and upon request of a party shall, require the child, mother, or alleged father to submit to genetic tests, including tests of blood or other tissues." NDCC 14–17–10(1). While the U.P.A. may not require the trial court to order genetic testing after an initial adjudication of paternity, see In the Interest of the Minor Child M.Z., 472 N.W.2d 222 (N.D.1991), the showing of sexual intercourse between Kelly and Barry during the time of conception surely enables pretrial discovery. See NDCC 14–17–11(1). NDCC 14–17–12(3) directs: "If ... genetic tests have not been administered, the court shall require the parties to submit to genetic tests, if practicable." Prior tests are not required by the non-uniform amendment.

#### 5. Conflicting presumptions

The progress of science surpasses the capacity of jurisprudence to cope with change.

THE SCIENCE OF GENETIC TESTING HAS REACHED A HIGH DEGREE OF ACCURACY, AND CURRENT TEST RESULTS TYPICALLY WILL EITHER EXCLUDE AN ALLEGED FATHER OR PRODUCE A STATISTICAL PROBABILITY OF PARENTAGE IN EXCESS OF 95 PERCENT. THE REGIONAL CHILD SUPPORT ENFORCEMENT OFFICES, WHO ARE MOST ACTIVE IN THE PATERNITY ESTABLISHMENT ARENA, RECOMMENDED THE CREATION OF A PRESUMPTION OF PATERNITY WHEN SUCH TEST RESULTS ARE OBTAINED.
SECTION 30 OF THE BILL AMENDS EXISTING LAW IDENTIFYING PARTIES WHO CAN BRING PATERNITY ACTIONS. THIS CROSS–REFERENCE WOULD BE NECESSITATED BY THE AMENDMENT DESCRIBED IN SECTION 29.
Testimony by Blaine Nordwall at the hearing on March 10, 1989, for SB 2245 before the House Human Services and Veteran Affairs Committee.

**2.** Legislative history reflects that the amendments to authorize other genetic tests were mandated by Section 111(b) of the Federal Family Support Act of 1988, 42 U.S.C. 666(a)(5), as part of the conditions for obtaining federal matching funds to establish paternity and to enforce child support. An assistant attorney general and legal counsel for the North Dakota Department of Human Services elaborated:
THE BILL ALSO CREATES A PRESUMPTION OF PATERNITY WHEN GENETIC TESTS SHOW A VERY HIGH STATISTICAL PROBABILITY OF PARENTAGE. THE CREATION OF THIS PRESUMPTION IS NOT REQUIRED BY FEDERAL LAW....
SECTION 29 OF THE BILL ACTUALLY CREATES THE PRESUMPTION OF PATERNITY. THE PRESUMPTION WOULD ARISE IN CASES WHERE GENETIC TESTS SHOW THAT THE ALLEGED FATHER IS NOT EXCLUDED AS A FATHER, AND THAT THE STATISTICAL PROBABILITY OF HIS PARENTAGE IS 95 PERCENT OR HIGHER.

Still, scientific advances in genetic testing have wholly alleviated the ancient problems of proof that shaped the traditional law of paternity. *Pickett v. Brown*, 462 U.S. 1, 17, 103 S.Ct. 2199, 2208, 76 L.Ed.2d 372 (1983); *Little v. Streater*, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981).[3] If the results of genetic testing show that Barry is not the biological father of Anna, this lawsuit is over, quickly and efficiently. If the tests show that Barry is the biological father, his rights and responsibilities in relationship to Anna will be determined under NDCC 14–17–14 of the Uniform Parentage Act in her best interests, not Barry's.

Unlike the majority, I would interpret the ambiguous language of the Uniform Parentage Act broadly, not obstructively. "A presumption ... may be rebutted in an appropriate action...." NDCC 14–17–04(2). "Any interested person may bring an action at any time...." NDCC 14–17–05(2). Thus, the constitutional questions, that the majority close their eyes to, would really not be present.

We construe statutes to avoid constitutional questions. *Walker v. Schneider*, 477 N.W.2d 167, 172 (N.D.1991); *In Interest of Goodwin*, 366 N.W.2d 809, 814 (N.D.1985). The design of the U.P.A. makes it possible to do so here. We can statutorily recognize Barry's standing, as an interested party, to establish his parental status as the genetic father of Anna, and to rebut Dean's status presumed from a marriage selected by Kelly after conception but before Anna's birth.

The Uniform Parentage Act directs that "[t]he parent and child relationship extends equally to every child and to every parent, *regardless of the marital status of the par-*

ents." NDCC 14–17–02 (emphasis added). Under the Act, the stronger of conflicting presumptions controls only the burden of persuasion, not standing to sue. "If two or more presumptions arise which conflict with each other, the presumption which *on the facts is founded on the weightier considerations of policy and logic controls.*" NDCC 14–17–04(2) (emphasis added). Under NDREv 301(a), a presumption only shifts the burden of proof to the party against whom it is directed. *In Interest of B.G.*, 477 N.W.2d 819 (N.D.1991). *See also Schweigert v. Provident Life Ins. Co.*, 503 N.W.2d 225 (N.D. 1993). NDREv 301, Explanatory Note, says: "[I]n all cases, presumptions are disputable and may be overcome by contrary evidence."[4] The marriage presumption for Dean may outweigh the genetic presumption for Barry. But the U.P.A. directs that the weightier one be determined by the trial court "on the facts" considered with "policy and logic." Thus, the presumptions control a claimant's burden of proof, not a claimant's standing to sue.

The doctrine of standing to sue stems from a judicial preference that a dispute be litigated by someone with a personal interest at stake. Black's Law Dictionary 1405 (6th ed. 1990). The personal interest assures that the dispute will be fully and competently litigated. Barry's biological claim is surely a personal interest sufficient for standing to sue. I believe, therefore, that the majority opinion misapplies the "standing to sue" doctrine when it rules that Barry does not have standing to bring this action.

### 6. Constitutional standing

The majority dodges the controlling set of opinions in *Michael H. v. Gerald D.*, 491 U.S.

---

3. The application of blood tests to the issue of paternity results from certain properties of the human blood groups and types: (a) the blood group and type of any individual can be determined at birth or shortly thereafter; (b) the blood group and type of every individual remain constant throughout life; and (c) the blood groups and types are inherited in accordance with Mendel's laws.
*Little v. Streater*, 452 U.S. 1, 7, 101 S.Ct. 2202, 2206, 68 L.Ed.2d 627 (1981) (summarizing S. Schatkin, Disputed Paternity Proceedings § 5.03 (1975)). Furthermore:
"The result of the test is universally accepted by distinguished scientific and medical author-

ity. There is, in fact, no living authority of repute, medical or legal, who may be cited adversely.... [T]here is now ... practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity."
*Ibid.*, quoting Schatkin, at § 9.13.

4. NDREv 301(b) also directs: "If presumptions are inconsistent, the presumption applies that is founded upon weightier considerations of policy. If considerations of policy are of equal weight neither presumption applies."

110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), that recognize the constitutional standing of a biological father who comes forward promptly. The swing vote by Justice Stevens, concurring in the result of Justice Scalia's plurality opinion, assumed "for the purpose of deciding this case that Michael's relationship with [his biological daughter] is strong enough to give him a constitutional right to try to convince a trial judge that [her] best interest would be served by granting him visitation rights." 491 U.S. at 133. Justice Stevens read the record differently than his colleagues, however, and was "satisfied ... that the California statute [a variation of the Uniform Parentage Act], as applied in this case, gave him that opportunity." *Id.* Justice Stevens thus recognized that Michael H. had a constitutional right to a hearing to determine his parental rights.

Justice Brennan, in his dissent joined by Justices Blackmun and Marshall, described "the common ground shared by a majority of [the] Court":

> Five Members of the Court refuse to foreclose "the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth." Five Justices agree that the flaw inhering in a conclusive presumption that terminates a constitutionally protected interest without any hearing whatsoever is a *procedural* one. Four Members of the Court agree that Michael H. has a liberty interest in his relationship with Victoria, and one assumes for purposes of this case that he does. In contrast, only one other Member of the Court fully endorses Justice Scalia's view of the proper method of analyzing questions arising under the Due Process Clause.

491 U.S. at 136, 109 S.Ct. at 2349 (citations omitted) (emphasis original). Justice White, in his separate dissent joined by Justice Brennan, also confirmed the due process views of a majority of the Court:

> Like JUSTICES BRENNAN, MARSHALL, BLACKMUN, and STEVENS, I do not agree with the plurality opinion's conclusion that a natural father can never "have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth." Prior cases here have recognized the liberty interest of a father in his relationship with his child....

491 U.S. at 157, 109 S.Ct. at 2359 (citation omitted). *Michael H.* thus held that the Due Process Clause bars a conclusive procedural presumption that forecloses a biological father's parental rights without any hearing whatsoever. I believe that Barry has constitutional standing to obtain a judicial determination of his parental rights.

### 7. Other precedents

Since *Michael H.* was decided, other jurisdictions with the Uniform Parentage Act have ruled that an unwed father has constitutional standing to sue to establish a parent-child relationship with his genetic offspring who was conceived before, and born after, marriage of the mother to another man. *See Michael M. v. Giovanna F.,* 7 Cal.Rptr.2d 460, 5 Cal.App.4th 1272 (1992) (applied to bar suit by biological father of child conceived out of wedlock but born after mother married another, UPA's standing provisions were infringement on his substantive due process rights); *Kelly v. Cataldo,* 488 N.W.2d 822 (Minn.App.), *review denied* (September 15, 1992) (remands claim by putative father of child conceived and born while mother was married to another, for joinder of child as party and for evaluation of competing statutory presumptions through consideration of child's best interests); *Matter of Marriage of Ross,* 245 Kan. 591, 783 P.2d 331 (1989) (best interests of child must be considered before choosing to use blood test evidence).

*See also In Re J.W.T.,* 1993 WL 233448 (Tex.1993) ("[A] father's interest in establishing a relationship with his biological child is constitutionally protected when accompanied by the father's early and unqualified acceptance of parental duties."); *County of Orange v. Leslie B.,* 17 Cal.Rptr.2d 797, 14 Cal.App.4th 976 (1993) (affirming mother's support judgment against natural father for daughter conceived and born while mother

was married to another man); *Adoption of Kelsey S.*, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (1992) (to extent statute allows a mother to unilaterally prevent her child's biological father from becoming presumed father, it violates equal protection guarantees; federal constitutional right to due process prohibits termination of an unwed father's parental relationship through adoption without a hearing when he promptly came forward to demonstrate his full commitment to his parental responsibilities); *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990) (putative father should have opportunity to prove parental relationship with child conceived and born while mother married to another man).

*R. McG. v. J.W.*, 200 Colo. 345, 615 P.2d 666, 671 (1980) held:

> We hold that so long as the UPA grants a natural mother judicial access for a period of years to seek a determination of paternity against the natural father of a child born during the marriage of the natural mother to another, equal protection of the laws under the United States and Colorado constitutions mandates that a claiming natural father be granted judicial access and standing to establish his paternity of that child during that same period of time.

A concurring opinion "recognized the due process right of a natural father, absent a finding that he is unfit, to maintain a parental relationship with his children." 615 P.2d at 673. These precedents strongly support Barry's standing to sue to establish a parental relationship with Anna.

### 8. My Analysis

I believe that Barry has procedural standing to sue to establish his parental relationship.[5] By exalting the role of a "father," selected by the mother after conception, the majority allows the mother to negate the procedural rights of a biological father who is prompt, ready, and willing to participate in parenting his child. This perpetuates the gender stereotype that the male parent does not participate in parenting. "It is the policy of this state to prohibit discrimination on the basis of ... status with regard to marriage...." NDCC 14–02.4–01. As Justice Levine said in *City of Mandan v. Fern*, 501 N.W.2d 739, 744 (N.D.1993): "Gender discrimination ... impedes equal justice for men and women." This is not a case where the mother is in an inherently different situation than the father. By making the marital presumption conclusive in this case, the majority allows the mother discretion to exclude the natural father at her whim by marrying someone else prior to birth. As *Caban v. Mohammed* clarified, 441 U.S. 380, 99 S.Ct. 1760, the female parent should no more be able to select the father after conception than to consent to adoption by wholly excluding the genetic father from the parental role.

Furthermore, the majority's interpretation will allow the child, her mother, or the marriage-presumed father to sue Barry at any time for many years to establish his parental responsibility for support. *See* NDCC 14–17–05(1)(b) and 14–17–06; *In Interest of K.B.*, 490 N.W.2d 715 (N.D.1992) (child, mother, and County Social Service Board not barred by 5–year limitation from suing biological father of thirteen-year old child born while mother married to another, but since divorced); *Pickett v. Brown*, 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) (two year limitation denies illegitimate children equal protection of the law); *Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (six-year limitation denies illegitimate children equal protection of the law); *Moug-*

---

5. I am puzzled by the failure of the majority opinion to squarely address due process standing. The Appellants' brief argued from Justice Scalia's opinion on due process standing in *Michael H.* without recognizing its minority status on that question. The Appellee's brief at p. 8 squarely relied on *Michael H.* to assert Barry's due process position that "the vast majority of the Court, in both concurring and dissenting opinions, held that ... the alleged 'natural' father had standing to bring such issues to the attention of the Court." In my opinion, Barry's due process standing was the central focus of this appeal, and Barry's equal protection arguments to reinforce his constitutional standing were a suitable mode of argument.

In any event, in view of the myriad of permutations in factual settings and the difficult distinctions made in the majority opinion, I would expect that this court will be called upon to consider many more appeals on due process standing of a biological parent.

*ey v. Salzwedel,* 401 N.W.2d 509 (N.D.1987) (after divorce, marriage-presumed father can sue genetically-presumed father for prior support of seven-year-old child in his home). The majority's interpretation unequally denies Barry standing to establish his parental relationship and responsibilities even though he has sought to do so promptly.

I cannot join an opinion denying a putative father standing to promptly seek to foster his parental relationship, when it leaves him open to later face his parental duties, while excluding him from the most precious time of the child's life. As *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, teaches by holding that a mother cannot block a father's parental rights by consenting to an adoption without the father's consent, there is a serious equal protection question when a ready, willing, and prompt father is denied an opportunity to establish his parental relationship.

Of course, if the trial court finds, as the majority opinion hints, that Kelly's sexual encounter with Barry was not consensual, the court could properly refuse Barry any legal relationship with Anna. It is questionable whether a non-consensual conception merits legal recognition. "[A] mere biological connection is insufficient to establish a liberty interest on the part of an unwed father." *Michael H.,* 491 U.S. at 143, n. 2, 109 S.Ct. at 2352, n. 2. (Justice Brennan, dissenting). Also, if Barry is motivated by jealousy, not parental impulse, it is unlikely that Anna's best interests merit his participation in her rearing. But those are factual matters to be determined at a trial, not summarily by judicial fiat. Procedural due process necessitates hearing and proof, not presumption and surmise.

A united family might often be more committed parents, but that is not invariably true, nor contemporary reality.[6] I view this situation, if Barry prevails in his proof, as akin to one where a divorced parent retains visitation rights after the remarriage of his former partner. In this commonplace situation, the law has resolved that the best interests of the child in preserving biological bonds outweighs any threat to family integrity.

I join Justice Brennan's view in saying that we should allow Barry a hearing to prove his paternity, while reserving our opinion about the ultimate state of affairs between Barry and Anna. "In order to change the current situation among these people, [Barry] first must convince a court that he is [Anna's] father, and even if he is able to do this, he will be denied visitation rights if that would be in [Anna's] best interests. . . . [A] determination that a State must afford procedures before it terminates a given right is not a prediction about the end result of those procedures." *Michael H.,* 491 U.S. at 156, 109 S.Ct. at 2359 (Justice Brennan, dissenting) (footnote omitted). Accordingly, I would affirm the trial court's denial of summary judgment, and remand for blood tests, discovery, and, as NDCC 14–17–14(3) of the Uniform Parentage Act specifies, for determination of the best interests of Anna.

---

6. According to Census Bureau figures, the proportion of American households consisting of a married couple and their own minor children has declined from 44.2% in 1960 to 27.0% in 1988.

Note, *Looking For a Family Resemblance: The Limits of the Functional Approach to the Legal Definition of Family,* 104 Harv.L.Rev. 1640, n. 1 (1991).

Unmarried fathers are not simply ones who can be categorized as absent or uncaring fathers. Clearly, there is an expanding population of unwed men who wish to play a role in the upbringing of their children. There also has been a renewed societal emphasis upon early establishment of paternity and vigorous enforcement of child support obligations (*see* the federal Child Support Enforcement Amendments of 1984 [P.L. 98–378], the Family Support Act of 1988 [P.L. 100–485], and the many subsequent state statutory enactments). Prefatory Note, Uniform Putative and Unknown Fathers Act, 9B U.L.A., 1993 Cumulative Annual Pocket Part at 44.